For Appellant: Shannon Hathaway, Montana Legal Justice, PLLC, Missoula, Montana
For Appellee: Timothy C. Fox, Montana Attorney General, Micheal S. Wellenstein, Assistant Attorney General, Helena, Montana, Scott D. Twito, Yellowstone County Attorney, Corbit Harrington, Deputy County Attorney, Billings, Montana
Justice Ingrid Gustafson delivered the Opinion of the Court.
***457 ¶1 R.U. (Mother) appeals from the termination of her parental rights issued July 27, 2018, by the Thirteenth Judicial District Court, Yellowstone County. We reverse and remand for the Department to engage in reasonable efforts to reunify Mother with R.J.F. (Child).
¶2 We restate the issues on appeal as follows:
1. Whether the Department engaged in reasonable efforts to prevent removal of Child and to reunite Mother with Child.
2. Whether the District Court erred in determining the conduct or condition rendering Mother unfit, unable, or unwilling to parent was unlikely to change within a reasonable time.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 The Montana Department of Health and Human Services, Child and Family Services Division (Department), became involved with Mother and Child when Mother tested positive for methamphetamine and marijuana at Child's birth in October 2016. At that time, Mother was temporarily in Billings, Montana, but lived in North Dakota. The Department removed Child from Mother's care on October 8, 2016. Ten days later, the Department filed its Petition for Emergency Protective Services (EPS), Adjudication as Youth in Need of Care (YINC) and Temporary Legal Custody (TLC) on October 18, 2016.[1] Mother returned to Williston, North Dakota-300 miles from Billings-where she resided, owned a residence, and had employment. The Department arranged visits for Mother "whenever she was in town ***458 or whenever she could make it to town." At the time, Mother did not have her own car and did not have a driver's license.
¶4 The court initially set the show cause hearing for November 1, 2016, but reset the hearing at the request of the Department to December 20, 2016, the time set for the adjudication and disposition hearing. On December 15, 2016, the Department again requested continuance of the hearings set for December 20, 2016, as it had not yet served putative fathers and needed time to serve them by publication. Despite Mother visiting Child in October and November 2016, and the Department knowing her whereabouts, the Department did not serve Mother with the Petition until December 16, 2016. The court reset the show cause, adjudication, and disposition hearings to February 21, 2017, over four months after Child's removal from Mother.[2]
¶5 Notwithstanding Mother did not own a car or have a valid driver's license, Mother *390 visited Child on October 20, 24, and 27, 2016, and attended his initial well-baby check-up. Mother further visited Child on November 18 and 30, 2017, December 15 and 16, 2017, and January 27, 2017. On January 11, 2017, Mother filed a petition to transfer venue pursuant to § 25-2-201(3), MCA, to Williams County, North Dakota where she resided.[3] Hearing on this petition was held February 21, 2017, at the same time as the show cause, adjudication, and disposition hearings. Child protection specialist (CPS) Bertoncelj, then assigned to the case, expressed concern at transferring the case to North Dakota. CPS Bertoncelj noted Mother had been inconsistent with visits, was somewhat disengaged in the last two months, and that ***459 she would hate for Child to be removed from the foster parents.[4] Child was residing in a non-kinship, foster placement with no ties to any family members, nearly 300 miles away from Mother. Mother's counsel noted the considerable distance between Billings and Williston, Mother's transportation problems, and winter weather as factors interfering with Mother's ability to engage and be present in Billings. He logically pointed out that the Department should be working to increase the bond between Mother and Child, not the bond between the foster parents and Child. The guardian ad litem did not object to Mother's request to transfer the case to North Dakota, advocating only for an orderly transition. The District Court denied the request to transfer venue, indicating she did not have information regarding the social worker in North Dakota and that she would want to talk to a North Dakota judge. The District Court did not direct anyone to obtain more information for her or make any arrangement for her to talk to a North Dakota judge, nor did the parties provide the court with additional information.[5] At the completion of the hearing, the District Court adjudicated Child as a YINC and granted the Department TLC for a period of six months. Two and a half months later, the District Court issued its written order denying the transfer.
¶6 CPS Reinhart was the assigned worker from Child's removal until December 2016. CPS Reinhart testified that during this time she worked with Mother on a voluntary service list that included a chemical dependency (CD) evaluation, random drug testing, meeting with her, and visits in Billings. Mother completed the CD evaluation ***460 with Kimberly McNamara in October 2016, which recommended Mother engage in outpatient treatment. CPS Reinhart testified to the reasonable efforts she made while assigned this case, "We did visits when we could ... She had prior been living in Williston, North Dakota, she had a house there so she wanted to go back there, and in the end, that's what she did. We set up visits whenever she was in town or whenever she could make it to town." CPS Reinhart also testified she wanted to set up drug testing, but she did not arrange for any such testing in North Dakota, instead relying on Mother to get this set up on her own. Mother was unable to arrange *391 for drug testing, or consistently meet with CPS Reinhart or visit Billings.
¶7 In late December 2016, CPS Bertoncelj took over Mother's case. Recognizing Mother's transportation problems, CPS Bertoncelj determined Mother should fly to Billings every couple of weeks for a visit with Child. She also determined since Mother would be coming to Billings every couple of weeks, it would be appropriate for her to obtain services in Billings rather than in North Dakota. As such, CPS Bertoncelj arranged for intermittent flights to Billings[6] and introduced Mother to the Center for Children and Families.
¶8 In March 2017, Mother was re-assigned new counsel and the Department filed a motion to approve a treatment plan for her. The proposed treatment plan was approved on April 6, 2017, six months after Child was removed from Mother's care. Despite the Department paying for intermittent plane tickets for Mother to visit Child, Mother had difficulties with transportation, work, and her active addiction. These difficulties significantly interfered with Mother's ability to make her scheduled visits. Consequently, she made less than half of them between December 2016 and July 2017. Although Mother struggled to address her issues, during this time she was in regular contact with CPS Bertoncelj. CPS Bertoncelj did not re-evaluate the viability of her plan that Mother obtain services in Billings and did not arrange for or refer Mother for services in North Dakota.
¶9 A Family Engagement Meeting (FEM) was held on August 17, 2017.[7] At this meeting, Mother identified two potential family members she desired the Department to consider as placements for Child: her mother, S.S., who also appeared telephonically at this FEM, and her ***461 maternal cousin, D.B.
¶10 On August 28, 2017, CPS Bertoncelj signed an affidavit in support of the Department's request to extend TLC and thereafter went on maternity leave. Mother was then assigned to work with CPS Herbst. Although CPS Herbst was aware of the Department's policy that whenever a child is placed in out-of-home care and the non-custodial parent is not an option, the Department must consider a child's extended family as placement, she did not seriously investigate whether either identified family member was a suitable placement for Child. Instead, CPS Herbst indicated she tried calling S.S. but never made contact, and did not consider S.S. as a placement as she thought Mother and S.S. did not have a good relationship. CPS Herbst made no inquiry whatsoever regarding Mother's cousin D.B. Upon taking over the case, CPS Herbst discontinued visitation assistance and did not reach out to establish any services in North Dakota for Mother. Less than a month after being assigned to the case and only eleven months since Child's removal, CPS Herbst executed an affidavit seeking termination of Mother's parental rights for failure to complete her treatment plan.
¶11 Mother recognized she had a drug problem and was unable to quit using drugs on her own. She felt she was not getting the help and support she needed to address this problem or to reunify with Child. Mother testified CPS Herbst told her that her only option was to leave her home in Williston and move to Billings. Mother advised CPS Herbst that she would have to sell her home to afford to move to Billings. Mother felt CPS Herbst was working against her and requested she be assigned a different CPS worker. Mother sold her trailer home and moved to Billings "[t]o fight [her] case and get clean." Upon her arrival in Billings, Mother contacted CPS Herbst, advised her where she was staying, and requested visitation. CPS Herbst advised Mother that she had a large caseload, did not have time to schedule visits, and had already filed for termination of Mother's parental rights.
¶12 The Department filed its Petition for Permanent Legal Custody and Termination of Parental Rights on September 18, 2017, only eleven months after its initial petition for EPS and only five months after Mother's treatment plan was put in place. The Department *392 asserted Mother had abandoned Child, failed to complete her treatment plan, and the conduct or condition rendering her unfit, unable, or unwilling to parent was unlikely to change within a reasonable time. Hearing on the termination petition was set for December 11, 2017. On October 4, 2017, the District Court granted the ***462 Department's petition to extend TLC. In this order, the District Court stated that the permanency plan was in the best interest of the child. However, no permanency plan had yet been presented to the District Court. On October 12, 2017, one year after Child's removal, CPS Herbst executed an affidavit requesting a permanency hearing in which she indicated adoption as the only permanency option. A permanency hearing was then scheduled at the same time as the termination hearing. On November 15, 2017, Mother filed a motion to vacate the termination hearing on the basis that the court had just granted a six-month extension of TLC. The Department objected and the court did not rule on this motion. On December 4, 2017, the Department sought continuance of the termination hearing and it was re-scheduled to February 12, 2018, at 4:00 p.m.
¶13 After moving to Billings, Mother obtained an updated CD evaluation from Lisa Hjelmstad in October 2017, which again recommended outpatient treatment, and began attending treatment and self-help meetings. Thereafter, Mother underwent a psychological evaluation with Dr. Veraldi. CPS Herbst did not meet with Mother to go over Hjelmstad's or Veraldi's evaluation recommendations, assuming the evaluators would follow up with Mother. CPS Herbst ultimately did refer Mother to visits at Family Works[8] and Mother arranged for the drug patch through Posse Partners. Mother also enrolled in and completed all but the final session of her parenting course. Notwithstanding the gains Mother made from October through November 2017-once she was actually receiving some services-the Department continued its pursuit to terminate Mother's parental rights. Mother felt CPS Herbst was not trying to help her and no matter what efforts she made, the Department intended to terminate her parental rights. Near the time set for the termination hearing in December 2017, Mother took a trip to North Dakota. While there, she relapsed, resulting in her hospitalization. Shortly after being released from the hospital, in early January 2018, Mother moved to California, where her mother and step-father live. Upon doing so, she contacted Child's father who assured her he would step-up, work with the Department, and obtain custody of Child.
¶14 On February 5, 2017, the Department moved the court to take ***463 judicial notice of Mother's non-compliance with her treatment plan pursuant to In re M.C. , 2017 MT 252, 389 Mont. 78, 403 P.3d 1266. Therein, the Department requested the court take judicial notice of written reports of experts and service providers-the psychological evaluation of Dr. Veraldi, CD assessments of Hjelmstad and McNamara, drug test results and other documents of Posse Partners, LLC., and visitation summaries and documents of Family Works-as the court had ordered such evaluations and services through Mother's treatment plan. The Department asserted these reports and services were admissible, over hearsay and foundational objection, pursuant to In re M.C . Mother sought continuance of the termination hearing as she needed additional time to respond to the Department's motion, the Department did not object, and the hearing was reset for March 19, 2019. Mother objected to the court taking judicial notice of the written reports of experts and service providers and admission of these reports to establish Mother's non-compliance with her treatment plan without testimony of the actual evaluators and service providers and without them being subject to cross-examination. Mother argued the Department's reliance on In re M.C. was misplaced, that this Court did not address basic foundational requirements resulting in Mother's inability to cross-examine the actual evaluators and providers, and that there was a difference *393 between treatment plan tasks and evaluations and services. The District Court interpreted In re M.C. to require admission of documents and written reports of experts and service providers ordered as part of the treatment plan, over otherwise valid hearsay and foundation objections and took judicial notice of Mother's non-compliance with her treatment plan.
¶15 At the time of the March 19, 2018 termination hearing, attorney Scott Pederson, prior guardian ad litem in this case, appeared on behalf of the Department. Recognizing he had previously served as the guardian ad litem, he asked the court to continue the matter. The court reset the hearing to April 23, 2018.
¶16 After moving to California, Mother made significant gains in addressing her substance abuse and overall stability. By the close of the termination hearing on June 8, 2017, Mother had been substance-free five months, was residing in a sober living home,[9] was participating in intensive outpatient treatment and one-on-one counseling through a CARF-certified treatment facility, was attending ***464 AA/NA meetings five to six times per week, had started a Friday evening self-help meeting group, was maintaining full-time employment, had obtained a valid driver's license, was undergoing drug testing at both her sober living home and treatment facility, and had completed an online parenting course. Additionally, she had a sponsor and was working the 12-steps (currently at step four) and volunteering at Stanton Detox. She had completed anger management and felt she had much better ability to cope with anger and frustration. She felt she had a real support system with her mother, step-father, sisters, grandmother, great aunt, and cousins in the area.
¶17 Shortly after relocating to California, Mother contacted CPS Herbst and learned Child's father had not been in contact with the Department. Mother told CPS Herbst she wanted to continue to work with the Department. She requested assistance with transportation costs for visits, but CPS Herbst denied the request. She requested Skype visitation, but CPS Herbst denied this indicating it was not age-appropriate. CPS Herbst did not refer Mother for any treatment or services in California, did not pursue any potential family placements, did not pursue an ICPC, or provide any additional assistance to Mother. Mother testified she repeatedly tried to contact CPS Herbst, but CPS Herbst generally did not answer Mother's calls. As such, Mother primarily contacted CPS Herbst through email. Mother testified she emailed CPS Herbst that she had enrolled in an online parenting course. Mother provided CPS Herbst with the course details and completed lessons from the course. CPS Herbst did not respond and did not advise Mother she would not accept the online parenting course in satisfaction of the parenting class task required by Mother's treatment plan.
¶18 At the termination hearing held on April 23, 2018, and June 8, 2018, CPS Herbst contended the conduct or condition making Mother unfit, unwilling, or unable to safely parent was continued drug use and lack of movement forward on her treatment plan. She faulted Mother for only living in Billings for three months, and that she did so after the petition for termination had already been filed. CPS Herbst admitted she knew Mother was living in a sober house in California, attending NA/AA meetings, had a sponsor, was employed, had written Child, had requested visitation, and had identified potential family placements. CPS Herbst asserted she had not seen results of Mother's drug testing, but then admitted she had not requested them from Mother or any provider.
¶19 The court determined Mother did not successfully complete her treatment plan and the condition rendering her unfit, unable, or ***465 unwilling to parent was not likely to change within a reasonable time and terminated her parental rights. Mother appeals.
STANDARD OF REVIEW
¶20 This Court reviews a district court's decision to terminate parental rights *394 for an abuse of discretion. In re A.S. , 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848 ; In re K.A. , 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478. The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been satisfied. In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing. In re K.L. , 2014 MT 28, ¶ 14, 373 Mont. 421, 318 P.3d 691. This Court reviews a district court's findings of fact for clear error and conclusions of law for correctness. In re M.V.R. , 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made." In re J.B. , 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715. "To reverse a district court's evidentiary ruling for an abuse of discretion, this Court must determine the district court either acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." In re I.M. , 2018 MT 61, ¶ 13, 391 Mont. 42, 414 P.3d 797.
DISCUSSION
¶21 1. Whether the Department engaged in reasonable efforts to prevent removal of Child and to reunite Mother with Child.
¶22 Mother asserts the Department violated her fundamental constitutional right to parent and abused its discretion by failing to provide Mother with the required reasonable efforts to reunify her with Child. Mother asserts the District Court abused its discretion and the Department violated its own policies when it did not transfer venue of the case to Williams County, North Dakota, where Mother resided. Although couched as a transfer of venue, this argument in essence asserts the Department did not provide reasonable efforts to reunify Mother and Child: by failing to place Child as close as possible to Mother's home; by failing to develop voluntary services and a treatment plan realistically designed to allow true bonding to occur between Mother and Child; and by failing to implement a service provision plan that could successfully address Mother's substance abuse problem-the conduct or condition rendering her unable to safely ***466 parent. Mother further asserts the Department failed to provide reasonable efforts by failing to provide Mother a courtesy worker both in North Dakota and California to assist her in accessing services to help her meet the goals of her treatment plan.
¶23 The Department contends it made reasonable efforts to reunify Mother and Child and technically did not violate its policy by failing to provide Mother a courtesy out-of-state CPS as the Department's policy only provides that if a parent moves to another county , the Department will assign a CPS in the new county where the parent is residing.
¶24 In termination proceedings, § 41-3-609(1)(f), MCA, protects a parent's fundamental right to the care and custody of a child. In re D.B. , 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. A district court may only terminate the parent-child relationship of an adjudicated YINC if it finds "by clear and convincing evidence that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time." In re X.M. , 2018 MT 264, ¶ 18, 393 Mont. 210, 429 P.3d 920 (citing § 41-3-609(1)(f)(i), (ii), MCA ).
¶25 Since "a natural parent's right to care and custody of a child is a fundamental liberty interest," a district court "must adequately address each applicable statutory requirement" before terminating an individual's parental rights. In re Matter of A.T ., 2003 MT 154, ¶ 10, 316 Mont. 255, 70 P.3d 1247. One such requirement is found in § 41-3-423(1), MCA, which provides in pertinent part:
The department shall make reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families that have been separated by the state. Reasonable efforts include but are not limited to voluntary protective *395 services agreements, development of individual written case plans specifying state efforts to reunify families, placement in the least disruptive setting possible, provision of services pursuant to a case plan, and periodic review of each case to ensure timely progress toward reunification or permanent placement. In determining preservation or reunification services to be provided and in making reasonable efforts at providing preservation or reunification services, the child's health and safety are of paramount concern.
(Emphasis added.)
¶26 Although determination of whether the Department made reasonable efforts is not a separate requirement for termination, it is a predicate for finding that the conduct or condition rendering a parent ***467 unfit, unwilling, or unable to parent is unlikely to change within a reasonable time-one of the factors required for termination of a parent's rights. See § 41-3-609(1)(f)(ii), MCA ; In re D.B ., ¶ 25.
¶27 The Department's policy provides:
When agency intervention into the family becomes necessary in order to protect the child, placement of the child as close as possible to the home of the birth parents provides the child maximum opportunity for visits with his/her birth parents while services are provided to the family. The goal should be to reunify the family, or if that is not possible, to promptly implement a permanent placement plan. The Division is committed to the expedited permanent placement of children who are placed in substitute care.... When the decision has been made to place the child, consideration should first be given to a placement with the non-custodial parent, extended family or kinship care home .... Factors to be considered in selecting a placement are ... the location of the child's family and the need to maintain contact with family members.
Child and Family Services Policy Manual, § 401-1 (DPHHS 2014), https://perma.cc/7J9J-FQF7 (emphasis added). Analysis of reasonable efforts is highly fact dependent. In re J.H. , 2016 MT 35, ¶ 17, 382 Mont. 214, 367 P.3d 339.
¶28 To meet its requirements to provide reasonable efforts, the Department must in good faith develop and implement voluntary services plans and treatment plans designed "to preserve the parent-child relationship and the family unit" and to meet the Department's policy to provide "the child maximum opportunity for visits with his/her birth parents while services are provided to the family." In re D.B. , ¶ 33 ; In re T.D.H. , 2015 MT 244, ¶ 42, 380 Mont. 401, 356 P.3d 457 ; Child and Family Services Policy Manual, § 401-1. Additionally, the Department must, in good faith, assist a parent in completing his or her voluntary services and treatment plan. In re D.B. , ¶ 33 ; In re T.D.H. , ¶ 42 ; Child and Family Services Policy Manual, § 401-1.
¶29 From our review of the record, we conclude the District Court erred in determining the Department provided reasonable efforts as required by § 41-3-423(1), MCA. Child was removed from Mother's care at birth because Mother tested positive for methamphetamine and ***468 marijuana.[10] *396 ¶30 Removal of an infant implicates different services than removal of an older child. The parent-child relationship plays a critical role in early childhood development. Wendy L. Haight, Jill Doner Kagle, James E. Black, Understanding and Supporting Parent-Child Relationships During Foster Care Visits: Attachment Theory and Research , 48 Soc. Work 195 (2003); Lucy Hudson, Eva Klain, Margaret Smariga, Victoria Youcha, Healing the Youngest Children: Model Court-Community Partnerships , American Bar Association (2007), https://perma.cc/5EJE-JJX3. Consistent and frequent family time visitation is a best practice for families in dependency cases. Peg Hess, Visiting Between Children in Care and their Families , The National Resource Center for Foster Care & Permanency Planning (2003), https://perma.cc/NJD3-KP4F; Child Welfare for the 21st Century: A Handbook of Practices, Policies, and Programs (Gerald P. Mallon, Peg McCartt Hess, eds., 2005). Contact between a child and the child's biological family is the single most important factor related to whether the child remains in out-of-home care. Visitation is strongly associated with shorter placement time and faster family reunification. During visitation, the parent-child attachment is strengthened. This helps prepare families for the transition from out-of-home care to returning home, and increases the likelihood of lasting reunification. The first visit should occur within forty-eight hours of removal. Child and Family Visitation Best Practice Guide (Tex. DPFS 2015), https://perma.cc/Q79J-X87J. There is a positive correlation between ***469 parent-child visitation and children's well-being while in placement care. Peg Hess, Visiting Between Children in Care and their Families , The National Resource Center for Foster Care & Permanency Planning (2003), https://perma.cc/NJD3-KP4F; Child Welfare for the 21st Century: A Handbook of Practices, Policies, and Programs (Gerald P. Mallon, Peg McCartt Hess, eds., 2005).
¶31 There are many best practices established for parent-child visitation. "[F]requent, meaningful parent-child visits are critical for infants and toddlers in foster care." Lucy Hudson, Eva Klain, Margaret Smariga, Victoria Youcha, Healing the Youngest Children: Model Court-Community Partnerships , American Bar Association (2007), https://perma.cc/5EJE-JJX3; Margaret Smariga, Visitation with Infants and Toddlers in Foster Care , American Bar Association (2007), https://perma.cc/QYZ4-C5B9. According to research-based best practice guides, frequency and duration of visitation goals vary for different age groups. For children birth to three years of age, best practice guides prescribe daily visitation and, if not daily, at the least, every two to three days. Margaret Smariga, Visitation with Infants and Toddlers in Foster Care , American Bar Association (2007), https://perma.cc/QYZ4-C5B9; Child and Family Visitation Best Practice Guide (Tex. DPFS 2015), https://perma.cc/Q79J-X87J.
Timely access to [chemical dependency] treatment, or the time it takes between a client's initial evaluation or assessment, and the engagement in treatment services, is a critical component for treatment success. Clients coming into treatment with substance use disorders often struggle with feelings of ambivalence towards treatment ... the window of opportunity for engagement will often be short.
What Works: Collaborative Practice Between Substance Abuse, Child Welfare, and the Courts , 8 (National Center on Substance Abuse and Child Welfare, 2014), https://perma.cc/PJ77-DVSV. "Clients also need quick access ... for substance use disorder assessments, the first step on the journey towards recovery." What Works: Collaborative Practice Between Substance Abuse, Child Welfare, and the Courts , 8 (National Center on Substance Abuse and Child Welfare, 2014), https://perma.cc/PJ77-DVSV. While we do not require the exercise of reasonable efforts to necessarily include these or other particular best practices, this information is consistent with and supports the underpinnings of the Department's policy requiring "placement of the child as close as possible to the home of the birth parents" and providing "the child maximum opportunity for visits with his/her birth parents while services are provided to the family." Child and Family ***470 Services Policy Manual, § 401-1; In re D.B. , ¶ 33 ; In re T.D.H. , ¶ 42. *397 ¶32 Child was removed from Mother's care on October 8, 2016. Mother had her first visit nearly two weeks later on October 20, 2016. For the first three months of Child's life, the Department knew Mother lived 300 miles away in another state, did not own a vehicle, and did not have a valid driver's license, yet developed voluntary services and provided visitation "whenever [Mother] was in town or whenever she could make it to town." Although Mother completed a CD evaluation that recommended outpatient treatment, no referral for treatment was made for Mother in North Dakota. While CPS Reinhart wanted to set up drug testing, she did not arrange for any such testing in North Dakota, but instead expected Mother to set this up on her own. In contradiction to Department policy, the Department placed Child 300 miles away from Mother's home in a non-kinship foster placement and did not engage in any efforts to identify or locate a potential kinship placement. After Mother identified two potential kinship placements, the Department failed to meaningfully investigate or pursue these placements. Further, no extended family resided in Billings or the surrounding area.
¶33 The Department's policy also requires the Department to document the reasons why the placement is in the best interests of the child "[i]f the child is not placed in close proximity (the same county) as the parent(s)' home." Child and Family Services Policy Manual, § 402-5 (Mont. DPHHS 2015), https://perma.cc/T3Y5-UD75. In selecting a placement, the Department considers: the services the child will need; the child's race and the role racial identity plays in the child's life; the availability and appropriate placement with siblings; the child's religion; and "the location of the child's family and the need to maintain contact with family members." Child and Family Services Policy Manual, § 401-1. Child was not determined to have any specialized needs and the record is void of any racial or religious considerations. The Department did not identify or document any reason why it was in the child's best interest to be placed in a non-kinship placement nearly 300 miles away from Mother's home. Instead, contrary to its own policies, the Department maintained a placement for Child which precluded Mother and Child from having sufficient contact to bond and failed to provide Mother with the services she reasonably needed to address her substance use disorder. In this regard, during the time CPS Reinhart was assigned to the case, the Department did not provide reasonable efforts to reunify Mother and Child.
¶34 Likewise, while CPS Bertoncelj was assigned to the case, the ***471 Department continued to fail to provide reasonable efforts designed to reunify Mother and Child. During this time, Mother was in active drug addiction and continued to have transportation problems. Until the court approved a treatment plan for Mother on April 6, 2017, the Department implemented voluntary services whereby the Department would arrange air travel for Mother to visit Child and receive services approximately every two weeks. Due to Mother's ongoing transportation problems and active addiction, she was not able to organize herself enough to consistently make her visitations. Despite Mother's demonstrated difficulties in travelling to Billings for visitation and services, the Department continued the very same child placement and visitation/service arrangement. Even if Mother had consistently made her visits, this minimal level of visitation was insufficient to build a bond between Mother and Child and permit her to demonstrate her ability to safely parent. Further, receiving services-presumably outpatient substance abuse treatment followed by a parenting course-for a few hours every couple of weeks would not realistically address Mother's substance abuse disorder, let alone address it in a timely manner. When Mother did not exhibit progress, the Department did nothing more to assist Mother in meeting the goals of her treatment plan. By the time CPS Bertoncelj went on maternity leave at the end of August 2017, nearly eleven months had elapsed since Child's removal and the Department had not yet provided reasonable efforts to reunify Mother and Child. For the first eleven months of this case, the Department primarily engaged in efforts to strengthen the bond between Child and the foster parents and faulted and penalized Mother for living in another state. *398 ¶35 When CPS Herbst took over for CPS Bertoncelj, CPS Herbst discontinued any transportation assistance to Mother to come to Billings and advised Mother her only option was to move to Billings. When Mother ultimately moved to Billings in late September 2017, the Department filed for termination of Mother's parental rights.
¶36 Upon moving to Billings, Mother made significant progress in meeting the goals of her treatment plan. She completed an updated CD evaluation and began treatment, and enrolled in a parenting course and completed all but the final class. She arranged for drug testing through Posse Partners, completed a psychological evaluation, maintained regular contact with the Department, obtained a residence, ***472 remained free from criminal activity,[11] attended visits, and signed all releases required by the Department. Despite this progress, the Department proceeded toward termination of Mother's parental rights. Not surprisingly, Mother felt that no matter what she did, the Department intended to terminate her parental rights. Also, not surprisingly, near the time set for the termination hearing, Mother relapsed and required hospitalization.[12] Shortly thereafter, Mother moved to California, re-engaged in treatment, and continued to build on the progress she began in October 2017.
¶37 While reasonable efforts do not require herculean efforts, they do require the Department to adhere to its policies and use its best efforts to place a child in close enough proximity to a parent to arrange visitation in sufficient frequency and duration to make it possible for a parent to establish a bond between herself and her child. Further, engaging in reasonable efforts requires more than merely suggesting services to a parent and waiting for the parent to then arrange those services for herself. Engaging in reasonable efforts requires the development and implementation of voluntary services and/or a treatment plan reasonably designed to address the parent's treatment and other needs precluding the parent from safely parenting. The means by which the Department prescribed Mother was going to accomplish visitation-whenever she could make it to Billings and later through flight every couple of weeks-would not realistically foster or develop a bond between Mother and Child. The means by which the Department prescribed Mother was going to accomplish chemical dependency treatment, drug testing, and a parenting course-arrange such herself and later refer Mother to arrange, obtain, and complete such when she was in Billings every other week-would not realistically address Mother's treatment needs. The Department's failure to provide reasonable efforts contributed to Mother's lack of progress over the first eleven months of this case. The District Court erred in determining the Department met its obligation to provide reasonable efforts throughout this case.
***473 ¶38 We have long held that a parent has an obligation to avail herself of services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan. In re C.B. , 2014 MT 4, ¶¶ 19, 23, 373 Mont. 204, 316 P.3d 177 ; In re D.F., 2007 MT 147, ¶ 29, 337 Mont. 461, 161 P.3d 825 ; In re T.R. , 2004 MT 388, ¶ 26, 325 Mont. 125, 104 P.3d 439 ; In re L.S. , 2003 MT 12, ¶ 11, 314 Mont. 42, 63 P.3d 497. This Court has consistently held that Montana law requires the Department to make reasonable efforts to reunite parents with their children, not herculean efforts. In re A.G. , 2016 MT 203, ¶ 17, 384 Mont. 361, 378 P.3d 1177. Our holding herein does not diminish a parent's obligation to engage with the Department or to avail herself of services arranged or referred by the Department in working toward successful completion of a treatment plan.
¶39 2. Whether the District Court erred in determining the conduct or condition rendering Mother unfit, unable, or unwilling to parent was unlikely to change within a reasonable time.
¶40 Mother asserts the District Court erred when it found the Department *399 presented clear and convincing evidence that the condition or conduct rendering her unfit to parent was unlikely to change in a reasonable time. Mother argues the evidence clearly shows she had already made substantial progress in achieving sobriety, the primary condition that made her unfit to parent. Contrarily, the Department argues that although Mother did begin to address her drug use, her being in treatment for a short time did not show her condition had changed or would likely change within a reasonable time. The Department asserts, pursuant to § 41-3-604(1), MCA, termination of Mother's parental rights is presumed to be in Child's best interest.[13] Section 41-3-604(1), MCA, provides:
(1) If a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights. If a child has been in foster care for 15 months of the most recent 22 months or if the court has found that reasonable efforts to preserve or reunify a child with the child's parent or guardian are not required pursuant to 41-3-423, a petition to terminate parental rights must be filed unless:
(a) the child is being cared for by a relative;
***474 (b) the department has not provided the services considered necessary for the safe return of the child to the child's home; or
(c) the department has documented a compelling reason, available for court review, for determining that filing a petition to terminate parental rights would not be in the best interests of the child.
¶41 In consideration of § 41-3-604(1)(b), MCA, and our conclusion that the Department failed to provide reasonable efforts to reunify Mother and Child throughout this case, the Department's reliance on the presumption in favor of termination is misplaced.
¶42 Section 41-3-609(2), MCA, provides:
In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care.
¶43 "[C]onduct or condition of the parent" means the condition or reason causing the treatment plan to be unsuccessful. In re J.B. , ¶ 22. In making its determination, a district court considers the "excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child." Section 41-3-609(2)(c), MCA.
¶44 Given the lack of reasonable efforts combined with Mother's considerable progress, the District Court erred when it found the Department presented clear and convincing evidence that the condition or conduct rendering Mother unfit to parent was unlikely to change in a reasonable time. Admittedly, it took Mother some time to fully recognize her substance-use disorder and engage in treatment, but this was compounded by the unique circumstances of her case. Mother had an active substance-use disorder, had just given birth to a newborn child, and resided in another state 300 miles away from Child. The delays in court proceedings and in providing Mother with a treatment plan additionally disadvantaged Mother. Although Mother experienced relapse, such is typical and expected with the disease of addiction and does not necessarily evidence change to be unlikely.[14] Mother presented ***475 clear and *400 convincing evidence that she had already made substantial progress, was fully engaged in treatment and her sobriety, and was on a path reasonably expected to lead to long-term sobriety and stability. The District Court erred in concluding the conduct rendering Mother unfit to parent was unlikely to change within a reasonable period of time.
¶45 In reviewing the procedural history of this case, it has come to our attention that the District Court misunderstood our holding in In re M.C . As other courts may do the same, we take this opportunity to clarify our In re M.C. holding. The District Court interpreted In re M.C. to require admission of documents and written reports of experts and service providers ordered as part of the treatment plan, over otherwise valid hearsay or foundational objections. The District Court thus admitted the psychological evaluation, CD assessments, drug testing results and documents, and visitation summaries and documents and took judicial notice of their contents and Mother's treatment non-compliance without any testimony from the experts or providers. Such a result was not intended to result from our holding in In re M.C.
¶46 In In re M.C. , as part of her treatment plan, Mother agreed to undergo a psychological evaluation and to follow the evaluation's recommendations in working towards reunification with M.C. In re M.C. , ¶ 3. Although the Department worked with Mother for over a year to reunify her with M.C., the reunification efforts were unsuccessful and the Department petitioned to terminate her parental rights. In re M.C. , ¶ 5. At the hearing on the petition, during the direct examination of the CPS worker, the Department moved for admission of Mother's psychological evaluation. Mother objected on grounds that it was inadmissible hearsay. The court admitted the psychological evaluation as a business record, but limited its use to the recommendations made therein. In re M.C. , ¶ 6. We upheld the district court's admission of the evaluation, which limited its use to the recommendations made therein, not as a business record exception to the hearsay rule, but pursuant to unique statutes permitting the court to order various examinations and evaluations and Mother's agreement to follow the evaluator's recommendations. In re M.C. , ¶ 13. Mother agreed as part of her treatment plan to undergo a psychological evaluation and follow its recommendations. After receiving the evaluation and its recommendations, Mother did not object to or ***476 contest the recommendations or otherwise request amendment or modification to her treatment plan. At the termination hearing, Mother's compliance with the recommendations of her psychological evaluation was one of the salient issues to be assessed by the district court. In re M.C. , ¶ 13. For the district court to determine whether Mother complied with the recommendations contained in her psychological evaluation, the district court determined it had to be able to access the recommendations contained in the report and as such admitted the report but limited its use to the recommendations contained therein. We upheld that determination and determined under the particular circumstances of the case, admission of the psychological evaluation for the purpose of determining whether Mother complied with the evaluation's recommendations was appropriate. In re M.C. , ¶¶ 13, 15. As Mother had not previously objected to or contested the recommendations contained in her psychological evaluation or sought modification or amendment of her treatment plan following her receipt of the recommendations, Mother was not permitted to contest the recommendations at the termination hearing or preclude their admission. In re M.C. , ¶ 14. We did not intend our holding to be interpreted to permit courts to admit any and all written expert reports or evaluations or service-related documents over otherwise valid hearsay or foundation objections.
¶47 We recognize there are no easy decisions in child dependency cases. Courts struggle with balancing the child's interest in permanency and stability against the parent's fundamental rights to parent. Substance use disorders are complicated brain-based diseases, the treatment of which involves the ongoing management of a lifelong *401 disease similar to diabetes, asthma, or high blood pressure. What Works: Collaborative Practice Between Substance Abuse, Child Welfare, and the Courts , 5-6 (National Center on Substance Abuse and Child Welfare, 2014), https://perma.cc/PJ77-DVSV. All too often substance use disorders are the primary cause of a parent's inability to safely parent and we recognize the challenges the Department faces to make limited services available to a growing number of parents facing these and similar obstacles as well as the challenges presented when a parent relapses, including delays in reunification or changes in permanency planning. We understand Child has been in the foster placement for over two years and is apparently thriving and there is no ***477 guarantee Mother's substance use disorder will remain in remission.[15] There are times, however, when the Court must recognize the parent has not received what the law guarantees before her rights may be terminated. This is such a case.
CONCLUSION
¶48 The Department failed to provide reasonable efforts to reunify Mother and Child. As such, Mother was not provided the services considered necessary for the safe return of Child to her care. Primarily, the Department refused to place child as close as possible to Mother's home, failed to obtain a courtesy CPS in North Dakota or California, and failed to develop and employ voluntary services and a treatment plan realistically designed to build a bond between Mother and Child and timely assist Mother in addressing her substance use disorder. Given the substantial change Mother had already accomplished by the time of the termination hearing combined with the Department's failure to provide reasonable efforts to reunite Mother and Child, the District Court erred in its determination that the Department established by clear and convincing evidence that the condition rendering Mother unfit to safely parent, namely her substance use disorder, was not likely to change within a reasonable time. It is appropriate to remand this matter to the District Court for the Department to provide Mother with reasonable efforts to reunify her with Child and for the District Court to conduct further proceedings consistent with this opinion.
¶49 Reversed and remanded.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.
BETH BAKER, J.
JIM RICE, J.

Pursuant to § 41-3-301(6), MCA, an abuse and neglect petition must be filed within five working days of the emergency removal of a child.

Pursuant to § 41-3-432(1)(a), (c), MCA, a show cause hearing "must be conducted within 20 days" of filing the initial petition unless otherwise stipulated by the parties or an extension of time is granted by the court upon a showing of "substantial injustice." While the court granted extension, the court did not analyze any substantial injustice requiring extension. Section 41-3-432, MCA, emphasizes the importance in expeditiously addressing child dependency cases. We encourage courts not to delay holding critical hearings for a present parent to serve unknown putative fathers by publication.

Section 25-2-201(3), MCA, requires, under general civil procedure rules, that the court change the place of trial "when the convenience of witnesses and the ends of justice would be promoted by the change." In a dependency and neglect action, however, jurisdiction and venue are provided for in § 41-3-103, MCA.

Mother testified she did well for the first few months following Child's birth but then relapsed back into drug use. She also testified she was arrested for not having a valid driver's license on October 31, 2016, while driving to Billings. These problems, known to the Department, impeded her ability to travel to Billings for visits.

Section 41-3-103(1)(a), MCA, provides that a district court has jurisdiction over "a youth who is within the state of Montana for any purpose." Section 40-3-103(2), MCA, provides that venue is proper in the county where the youth is located or a county where the youth's parent resides or has resided within 180 days before the petition was filed. Although pursuant to § 41-3-103, MCA, jurisdiction and venue were proper in Yellowstone County, Montana, they were also proper in Williams County, North Dakota. While there was no legal requirement to transfer the case under Montana's jurisdiction statutes, transferring a case to another venue or jurisdiction is not difficult and is routinely accomplished by courts and the Department through use of the Uniform Child Custody Jurisdiction and Enforcement Act. Section 40-7-101, et seq. , MCA. The District Court could easily have directed the Department to contact its sister organization in Williston to assign a courtesy worker and make arrangements to transfer the case.

Mother continued to have transportation problems as she had to travel approximately an hour to the airport and did not have a car or a valid driver's license.

This was the only FEM held in this case.

The Department faulted Mother for leaving some visits early. Mother explained she did so as many of the visits were scheduled and held during times when Child was napping and she could not actively engage with Child. Mother had to specifically request visits not be made for times when Child was known to be napping.

Were Child to be placed in her care, Mother would be able to move to a sober living home for women and children.

The National Center on Substance Abuse and Child Welfare asserts that, given no other safety concerns, "a positive drug test or a series of positive drug tests should not be used as the sole determining factor in the removal of a child from the home or to determine parental visitation." Drug Testing in Child Welfare , National Center on Substance Abuse and Child Welfare (2010), https://perma.cc/TCA2-4GWY.
The most effective way to identify a substance use disorder or determine if a child is at risk for maltreatment or neglect is to use a combination of screening and assessment tools inclusive of safety and risk assessments, clinical instruments, random drug testing, self-reports, and observations of behavioral indicators.
Drug Testing in Child Welfare , National Center on Substance Abuse and Child Welfare (2010), https://perma.cc/TCA2-4GWY. Other than Mother's testing positive at Child's birth, no Family Functioning Assessment or other screening or assessment results were entered to determine risk. Further, no other evidence was presented to establish there were no reasonable efforts the Department could undertake with Mother to avoid removal of Child from her care. As Mother does not assert in her appeal that the Department failed to provide reasonable efforts to avoid removal, we do not discuss this further.

Mother's treatment plan required her to remain in good standing with her assigned probation officer. It is noted that Mother has at no time during this case been on probation.

Mother suffers from addiction. According to the American Society of Addiction Medicine (ASAM), "[l]ike other chronic diseases, addiction often involves cycles of relapse and remission." Public Policy Statement: Definition of Addiction , ASAM (2011), https://perma.cc/XN2W-PW6A.

It is noted that at the time the Department filed its petition for termination, Child had not been out of the home for fifteen months, thus the Department is not entitled to the best-interest presumption it asserts.

Although addiction often involves cycles of relapse and remission, it does not excuse behaviors of relapse or one's obligation to seek and participate in treatment, but instead better informs the treatment and services a person with a substance use disorder needs to address the problem. Unfortunately, even in circumstances where a parent is provided timely services and opportunity to engage, there will be times where a parent is ultimately unable to attain sufficient remission to parent safely within the time frame needed to meet the child's best interests for permanency.

"The treatment of chronic diseases involves lifestyle changes to accommodate medical and behavioral recommendations. Behavioral changes rarely progress in a straight line, but instead involve periods in which people return to their old behaviors despite negative consequences. Diabetes, asthma, and hypertension patients struggle with relapse at nearly the same rate as people with substance use disorders." What Works: Collaborative Practice Between Substance Abuse, Child Welfare, and the Courts , 6 (National Center on Substance Abuse and Child Welfare, 2014), https://perma.cc/PJ77-DVSV.