FILED

12/08/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0026

DA 20-0026

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 307N

IN THE MATTER OF:

T.N.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and For the County of Custer, Cause No. DN 18-16
Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kelly M. Driscoll, Driscoll Hathaway Law Group, Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

Wyatt A. Glade, Custer County Attorney, Miles City, Montana

Submitted on Briefs: October 28, 2020

Decided: December 8, 2020

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Petitioner W.A. ("Mother") appeals the Sixteenth Judicial District Court's December 18, 2019 Order terminating her parental rights to her child, T.N. Mother argues that the Department of Public Health and Human Services, Child and Family Services Division ("Department"), failed to provide reasonable efforts toward her reunification with T.N. We conclude that the District Court did not clearly err in finding that the Department had made reasonable efforts under the circumstances and did not abuse its discretion when it terminated Mother's parental rights. We accordingly affirm.

¶3 Following the separation of Mother and J.N. ("Father") in 2016, T.N. initially resided with Mother. In July 2016 T.N. began residing primarily with Father. After receiving a report concerning Father's alcohol use and physical neglect of T.N., the Department removed T.N. from Father's home on March 23, 2018. It placed T.N. in non-kinship foster care in Miles City, Montana. On April 4, 2018, pursuant to §§ 41-3-102, 41-3-301, and 41-3-427(2)(a)-(h), MCA, the Department filed a petition for emergency protective services, for adjudication of T.N. as a Youth in Need of Care ("YINC"), and for temporary legal custody. The Department included an affidavit from a child protection specialist ("CPS"), stating that Father said Mother "has not cared

2

for their daughter for many months and that she does not have a significant relationship with her." During T.N.'s time with Father, Mother was charged in Yellowstone County with criminal possession of dangerous drugs, methamphetamine, and criminal possession of drug paraphernalia. She absconded to Tennessee after her initial appearance, and she was arrested and incarcerated there in February 2018 for theft.

¶4 The District Court issued an order to show cause, granting emergency protective services and setting a show cause hearing. On May 17, 2018, following that hearing, the District Court granted the Department temporary legal custody and adjudicated T.N. to be a YINC. The District Court approved a treatment plan for Mother the next day, requiring Mother to refrain from use of alcohol and drugs; obtain a chemical dependency evaluation and follow recommendations; submit to random drug testing; obtain housing and employment; complete a mental health evaluation and follow recommendations; and complete the Interstate Compact on the Placement of Children ("ICPC") process and follow recommendations to be considered as a placement.

¶5 Mother was released from jail in Tennessee on July 2, 2018, and moved in with her mother in Omaha, Nebraska, "to be near the support of her family." Mother had only three visitations with T.N. while living in Nebraska. Mother was employed at this time, however, and she obtained chemical dependency and mental health evaluations. Mother signed a release for these evaluations for the CPS assigned to T.N.'s case in Montana, but the CPS never received them.

¶6 Following a foster care meeting in which Mother participated, the Department filed a Foster Care Plan on October 26, 2018. The plan noted that T.N. would remain in

3

non-kinship foster placement, with the permanency goals of either: (A) reunification with Father as the primary goal; or (B) adoption. The plan did not identify reunification with Mother as a permanency plan alternative. Instead, it stated that T.N. could not safely be reunified with Mother, but that Mother was "receiving appropriate services designed to reunify the child with [her]," that an ICPC application had been submitted, and that Mother had regular visitation with T.N. up to that date, consisting of a weekly phone call with T.N. and T.N.'s therapist. The attached Child Assessment by Foster Care Provider stated that T.N.'s visitations with Mother had "[t]rigger[ed] depression and wetting the bed."

¶7 Between October 2018 and July 2019, the District Court granted two extensions of temporary legal custody to the Department to allow the parents additional time to successfully complete their treatment plans. The Department indicated that T.N. was making significant progress while in foster care since the time of removal.

¶8 Mother relapsed while in Nebraska. She was arrested there in January 2019 and transported to the Yellowstone County Detention Facility. At this time, Mother requested assistance of the CPS to re-engage visits with T.N., which did not occur before Mother's sentencing on May 17, 2019. Mother received a five-year suspended sentence and was ordered to immediately attend and complete rehabilitation at the True North Program at Rimrock in Billings.

¶9 Meanwhile, on March 25, 2019, the Department filed a motion for approval of its proposed permanency plan for reunification with Father, estimating an additional six months' time until reunification could be achieved. At the hearing on the petition, Mother's attorney indicated she had been unable to reach Mother, but Father advised the

4

District Court where Mother was located and that "she accepts all the things that are occurring here today." On April 12, 2019, the District Court issued an order granting the petition and approving the permanency plan. A new foster care case plan was filed a month later. It stated that progress toward alleviating the need for placement had been made by Father, but not by Mother, and that T.N. could be safely reunified with Father. The document showed that the CPS had only one contact with Mother between October 15, 2018, and March 20, 2019, when Mother was living in Nebraska.

¶10 Despite knowing her sentence would be revoked if she did not complete the program, Mother left Rimrock on May 21, 2019—four days after being sentenced—because a family emergency required her to care for her sister's children. Mother maintained regular contact with her probation officer, was employed as a server at a local restaurant in Billings, and had some contact with T.N. through Father during this time. Mother's sentence was revoked on August 9, 2019, and she again was incarcerated at the Yellowstone County Detention Facility.

¶11 T.N. was placed with Father for a trial home visit on June 1, 2019. On August 23, 2019, however, the Department reported to the court that Father had assaulted T.N. while significantly intoxicated. T.N. was placed back in foster care. The report stated further that Mother was incarcerated and "has not engaged with the Department regarding her court-ordered service treatment plan progress or to inquire on the status of her child since approximately May 2019." Mother alleges that neither the CPS nor the Department notified her of the assault.

5

¶12 On September 20, 2019, the Department filed a petition for termination of parental rights and permanent legal custody pursuant to § 41-3-609(1)(f), MCA. The petition stated that T.N. had been in out-of-home placement since March 23, 2018, approximately 18 months, that the parents had not successfully completed their treatment plans, and that the conduct or conditions rendering the parents unfit were unlikely to change within a reasonable time. With regard to Mother, the petition noted: the ICPC process was denied because Mother "stat[ed] that reunification with [T.N.]'s birth father was going to happen and [Mother] chose not to proceed with the requirements for a home study and further investigation by the State of Nebraska"; the Department had not received Mother's required evaluations and it was unknown what substance use/chemical dependency tasks and mental health tasks had been completed "due to [Mother's] sporadic communication with the Department since leaving Nebraska in early 2019"; Mother had been incarcerated or in temporary placement for the entirety of the case; Mother had employment for a short period, but was incarcerated or enrolled in inpatient treatment during most of the case; and "[Mother] did not actively engage with the Department in communicating her whereabouts, her treatment plan progress, her need for services and assistance and overall struggles limiting her from reunification with her child," all of which were further hampered by "her transient lifestyle that included numerous moves in and out of the State of Montana, multiple incarcerations, and . . . time in inpatient treatment in Billings, Montana."

¶13 A few days later, after it received a letter from Mother, the District Court set a review hearing. Mother expressed in the letter that she felt she was not being given a proper chance or being heard. She further expressed that her attorney was not adequately

6

representing her. Mother stated that it was in T.N.'s best interest to be reunited with her, that she had been accepted into the treatment program at Passages in Billings, and that she requested the court to "please postpone making any decisions to terminate my rights till I have a chance to actually 'fight.'" Mother acknowledged her addiction and complacency in the case, but she stated that her complacency was due to the Department's focus on the Father. Mother stated:

> ALL focus was on the Father . . . . So where did I fit into the picture with [the Department and the CPS]? I didn't. . . . It was easier for me to go thru [sic] the Father & have contact with [T.N.] so that's what I did. I had still heard NOTHING back from [the CPS] on phone calls or visits with [T.N.].

Mother also questioned, "[w]hy would [the CPS] set-up visits between my child [and] myself and a Treatment plan knowing I was on the 'run' from the law? I feel I was set up to fail from the start in a way."

¶14 Mother's attorney was present for the review hearing, with Mother appearing remotely from custody. Mother stated that she wanted new counsel because she did not feel her current counsel was representing her and T.N.'s best interests. Mother said counsel was not listening to her wishes and only advised her that "[t]his is what's going to happen and there is nothing that we can do about it." The District Court denied Mother's request for substitution of counsel, reasoning that Mother had not yet sought replacement counsel through the Office of the Public Defender grievance process, and that, upon conducting an initial inquiry with Mother and counsel at the hearing, there was no "seemingly substantial" concern of ineffective assistance of counsel, conflict of interest, or a complete collapse in

7

attorney-client relationship or total lack of communication. The District Court found that Mother believed she could still communicate with counsel to present a defense.

¶15 The day prior to the scheduled termination hearing, the Court Appointed Special Advocate ("CASA") filed a Report, indicating that "visits with birth mother via video . . . had not been facilitated in the past due to hopes of reunification with birth father." The CASA expressed concern about visits "that have started within such a short time period, given T.N.'s special needs." The CASA recommended termination of parental rights, opining that Mother "will not be able to parent within a reasonable period of time" and that termination is in T.N.'s best interest.

¶16 At the December 13, 2019 hearing on the petition for termination of parental rights, Mother, her case worker at Passages, and the CPS testified. The case worker testified that Mother would complete her current phase of the program, Alcohol and Drug Treatment, by March 3, 2020, and then would have an estimated six-month stay in pre-release, for an estimated discharge date of September 2020. The case worker further testified that Mother would not be allowed to have T.N. with her during the program. The case worker testified that Mother was "doing great," was taking required classes, and was on the wait list for non-mandatory Parenting Classes.

¶17 The CPS testified that an ICPC had been requested with Nebraska, but that placement was denied due to Mother's statement that the Department intended to reunify T.N. with Father. She testified that Mother did complete chemical dependency and mental health evaluations and signed a release for the CPS while in Nebraska, but that they were never received. The CPS also testified to her communication with Mother, stating

8

that most communication was written and was limited due to Mother's incarceration and participation in treatment programs. In response to questions about the CPS's communication with Mother, the CPS stated that most of her communication with Mother had been by exchange of letters, but they had phone calls when that was available and tried to maintain weekly contact. The CPS stated that "[t]he Department did make every effort to communicate with her with the appropriate method that was allowed based on her location."

¶18  The CPS testified to her reasonable efforts toward T.N.'s reunification with the family, including a search for kinship placement, formulation of treatment plans based on the parents' needs, referrals to providers, work with Nebraska to determine someone who would work well with Mother, weekly contact with the parents, and assistance with gas and housing. On cross-examination, she acknowledged that most of the services were directed toward Father because it was the Department's plan to place the child with him. She said that she had, however, offered Mother assistance in finding options for and facilitating referrals, but acknowledged that she had not assisted Mother in finding providers for chemical dependency or mental health while Mother was out of the state. The CPS confirmed that Mother and T.N. had visits only when Mother was in Nebraska and that the Department never facilitated a family engagement meeting.

¶19  Finally, Mother testified that she received no assistance from the Department in completing treatment plan tasks and had instead sought out these services on her own and paid for them herself. Mother stated that she withdrew the ICPC request because reunification with Father was the goal at the time and she did not want to remove T.N. from

9

her community and service providers. Mother testified that, following her release from Passages, she would be able to secure employment with her former employer. She testified that she already was on two housing lists and could have T.N. temporarily reside with her at her sister's home if necessary.

¶20 At the end of the hearing, Mother's attorney moved to hold the hearing in abeyance for Mother to complete her treatment program and the Court to consider temporary placement with the family, arguing that the Department "did not comply with the requirement to provide reasonable services with her in order to promote the reunification with [T.N.] based upon the testimony and contact between mother and daughter, and the [D]epartment not providing active assistance in time to get services."

¶21 The District Court denied Mother's request, concluding that the Department's efforts were reasonable, that Mother had not completed her treatment plan, and that it would not be in the child's best interest "to continue to kick the can down the road and not provide the child stability, not provide the child permanency, but instead to hold on to a situation with [M]other that has not panned out over the last two years" and would likely take at least another year to complete. The District Court thus concluded that there was clear and convincing evidence that termination of Mother's rights was in T.N.'s best interest.

¶22 The court followed several days later with its written Findings of Fact, Conclusions of Law, and Order Terminating Parental Rights and Granting Permanent Legal Custody, terminating the parental rights of both Father and Mother. The District Court found by clear and convincing evidence that T.N. was adjudicated a YINC, that Mother had been

unsuccessful in her treatment plan, and that the conduct or condition rendering Mother unfit was unlikely to change within a reasonable time. Focusing primarily on the physical, mental, and emotional conditions and needs of T.N., the District Court based its decision on four primary aspects of Mother's conduct or condition:

    a. the birth mother's emotional illness, mental illness, or mental deficiency of a duration or nature as to render the birth mother unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

    b. the birth mother's excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the birth mother's ability to care and provide for the child;

    c. the birth mother's present judicially ordered long-term confinement; and

    d. the birth mother failing to complete all aspects of her court ordered service treatment plan.

¶23 The District Court found that the Department had made reasonable efforts to facilitate Mother's treatment plan and reunification with T.N. The court acknowledged in its findings that the Department did not identify Nebraska service providers or arrange Mother's Nebraska appointments but that Mother understood the treatment plan requirements and obtained the chemical dependency and mental health evaluations that were required. The court found that Mother declined to complete the home study because she perceived the Department would return T.N. to Father's care and "seemed satisfied" with that. "When the ICPC process fizzled, so too did the Department's effort to engage a courtesy social worker for Mother in Nebraska." The court concluded:

Given the impeding factor that each day since March 23, 2018, Mother has been jailed, or in an inpatient chemical dependency program, or subject to

11

arrest based on prior violation, the Department's efforts to facilitate Mother's Treatment Plan and reunification were reasonable efforts.

¶24 A court may terminate parental rights upon finding by clear and convincing evidence that: (1) the child was adjudicated a YINC, (2) the parent failed to successfully complete a court-ordered treatment plan, and (3) the condition or conduct rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. This Court presumes a district court's decision to terminate parental rights to be correct and "will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re Matter of E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690 (citation omitted).

¶25 Mother asserts on appeal that the District Court lacked clear and convincing evidence to support the statutory requirements for termination and that the Department's failure to provide her with reasonable efforts calls into question the court's conclusion that her conduct was unlikely to change within a reasonable time. We review a district court's finding that the Department made reasonable efforts for clear error; clear error exists when a finding is not supported by substantial, credible evidence in the record. *In re R.J.F.*, 2019 MT 113, ¶ 20, 395 Mont. 454, 443 P.3d 387.

¶26 Montana law requires the Department to make "reasonable efforts" to reunify a child with the family, which requires the Department to, "in good faith, assist a parent in completing his or her voluntary services and treatment plan." Section 41-3-423(1), MCA; *In re R.J.F.*, ¶ 28 (citations omitted). "[W]hether the Department made reasonable efforts is not, itself, a required finding for termination under § 41-3-609(1)(f), MCA. Though not

12

appealable on its own, the issue may be addressed as part of an appeal from the requisite statutory findings." *In re C.M.G.*, 2020 MT 15, ¶ 13 n.3, 398 Mont. 369, 456 P.3d 1017 (citing *In re C.M.*, 2019 MT 227, ¶ 22, 397 Mont. 275, 449 P.3d 806; *In re R.J.F.*, ¶ 26; *In re D.B.*, 2007 MT 246, ¶ 25, 339 Mont. 240, 168 P.3d 691). The parent also has an obligation to engage with the Department to successfully complete her treatment plan. *In re R.J.F.*, ¶ 38; *In re C.M.*, ¶ 19; *In re R.L.*, 2019 MT 267, ¶ 20, 397 Mont. 507, 452 P.3d 890; *In re C.M.G.*, ¶ 17. Thus, the amount and type of efforts are highly fact-dependent. *See In re R.J.F.*, ¶ 27 (citation omitted). Ultimately, "a parent's unlikelihood of change may well be unaffected by the Department's efforts." *In re C.M.*, ¶ 22.

¶27 Mother alleges four specific deficiencies in the Department's efforts. Three allege the Department's inadequate efforts to communicate with Mother or provide services or referrals to enable Mother to complete her treatment plan, or to connect her with a courtesy CPS in Tennessee or Nebraska to do the same. Under § 41-3-423(1), MCA, reasonable efforts typically include "provision of services pursuant to a case plan." When assisting a parent with her treatment plan, the Department must do "more than merely suggest[] services to a parent and wait[] for the parent to then arrange those services for herself." *In re R.L.*, ¶ 22. Although the District Court acknowledged the Department could have done more in assisting Mother with completion of her treatment plan tasks, there was substantial, credible evidence in the record that, given the circumstances, the Department's focus on Father was reasonable. Father had been T.N.'s sole caretaker for nearly two years before removal and was engaged and showing promise in completing his treatment plan.

13

In contrast, Mother fled the state and was incarcerated or in treatment programs throughout most of the case; she had not cared for T.N. for some time prior to removal; she had a significant history of drug use, mental health difficulties, and criminal conduct, all of which continued during the pendency of the case; and she was less engaged in the process than Father.

¶28 Mother argues that the Department failed to facilitate visitation opportunities between Mother and T.N. If the Department creates a treatment plan for an incarcerated parent, the same burdens and good-faith requirements apply. *In re Matter of A.T.*, 2003 MT 154, ¶¶ 23-25, 316 Mont. 255, 70 P.3d 1247. The record demonstrated, however, that visits initially were hampered because Mother was "on the run from the law" and that, when telephone visits started, T.N. had negative reactions to Mother's communication— being triggered with depressive episodes and wetting the bed. This resulted in supervised visits, and Mother's subsequent incarceration made that difficult. By the time Mother was back in a place where visits could occur and expressing interest in engaging, the case had progressed toward reunification with Father. It was not unreasonable for the Department to pursue that reunification, given his progress, the statutory preference toward placement with a parent, and the dispositional alternative of placing the child with one parent and dismissing the case. *See* § 41-3-438(3), MCA.

¶29 In determining whether Mother's conduct or condition was likely to change within a reasonable time, the District Court properly considered the specific circumstances of the case and T.N.'s physical, mental, and emotional needs—including her special education

14

needs, her need for stability, and the amount of time she already had been in foster care.[1] *See In re D.F.*, 2007 MT 147, ¶ 43, 337 Mont. 461, 161 P.3d 825. Parental rights must be protected with fundamentally fair procedures; at the same time, courts must give primary consideration to the best interest and welfare of the child. Section 41-3-432(1)(c), MCA; *In re L.V.-B.*, 2014 MT 13, ¶ 15, 373 Mont. 344, 317 P.3d 191 (citations omitted); *see also In re J.B.K.*, 2004 MT 202, ¶ 17, 322 Mont. 286, 95 P.3d 699 (stating that § 41-3-609(1)(f), MCA, "does not provide that a parent must be given as much time as it takes for successful completion of a plan").

¶30 The District Court did not abuse its discretion by concluding that Mother had not completed her treatment plan and was unlikely to do so in a reasonable time. There was substantial evidence of Mother's history of substance abuse; it showed that Mother was an intravenous methamphetamine user for over 20 years. The evidence also showed Mother's past criminal conduct and incarceration, including her decision to abscond from pending charges and continue her criminal conduct, leading to her repeated incarcerations.

¶31 The District Court additionally based its conclusion in part on Mother's failure to actively engage in and complete her treatment plan. *See In re R.L.*, ¶¶ 20-21, 25 (a court may consider whether a parent availed herself of services when evaluating the Department's efforts and ultimately whether parent's conduct or condition will change within a reasonable time). There was substantial evidence that Mother failed to pursue or

---

[1] Mother contends that the Department's lack of efforts toward reunification should have precluded application of the presumption under § 41-3-604(1), MCA, toward termination when a child has been in temporary placement for at least 15 out of the 22 most recent months. Based on our disposition of the reasonable efforts claim, we do not address this argument.

follow through with opportunities to address her substance abuse. Regardless of her reasons, Mother left the Rimrock treatment program and generally failed to prioritize seeking treatment in a timely fashion to ensure she was available to parent should Father's efforts toward reunification fail.

¶32 On the whole of the record, the District Court did not clearly err in its finding that the Department made reasonable efforts under the circumstances. We agree that the Department was not required to go through the ICPC process while Mother was in Nebraska, *see In re E.Y.R.*, 2019 MT 189, ¶ 30, 396 Mont. 515, 446 P.3d 1117, but Mother showed no interest at that time in having T.N. placed with her. The reasonableness of the Department's efforts "is not static or determined in a vacuum, but rather is dependent on the factual circumstances of each case—the totality of the circumstances—including a parent's apathy and/or disregard for the Department's attempts to engage and assist the parent." *In re C.M.G.*, ¶ 17 (quoting *In re R.L.*, ¶ 22).

¶33 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. There was substantial credible evidence to support the finding that Mother's unlikelihood of change within a reasonable time was due in significant part to her decision to abscond from pending charges, her continued criminal behaviors leading to additional incarcerations, and her failure to follow through with opportunities to treat her substance abuse and mental health struggles. When substantial evidence in the record supports a district court's findings of fact, we will not re-weigh that evidence to hold the court in error. In the opinion of the Court, the District Court's findings of fact were not clearly erroneous and its ruling

16

was not an abuse of discretion.  The District Court's December 18, 2019, Order terminating

Mother's parental rights is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE