No. 04-405

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 388

IN THE MATTER OF T.R., S.R., and C.G.R.,

Youths in Need of Care,

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DN 2002-066
The Honorable Ingrid G. Gustafson, Judge presiding.

COUNSEL OF RECORD:

For Appellant Father:

Fred Snodgrass, Attorney at Law, Billings, Montana

For Respondent:

Honorable Mike McGrath, Montana Attorney General, Jennifer Anders,
Assistant Attorney General, Judy Williams, Assistant Attorney General,
Child Protection Unit, Helena, Montana; Dennis Paxinos, Yellowstone
County Attorney, Billings, Montana

For Youths:

Patrick E. Kenney, Attorney at Law, Billings, Montana (Guardian ad Litem)

Submitted on Briefs:  November 18, 2004

Decided:  December 29, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 K.M.E. appeals from the Findings of Fact, Conclusions of Law, and Order of the Thirteenth Judicial District Court, Yellowstone County, in which the court terminated his parental rights to T.R., S.R., and C.G.R. We affirm.

**ISSUE**

¶2 Did the District Court err when it terminated K.M.E.'s parental rights to T.R., S.R., and C.G.R.?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 K.M.E. is the natural father of T.R., S.R., and C.G.R. T.R. and S.R. were adjudicated as Youths in Need of Care by Order of the District Court from the bench on December 19, 2002, with the written order dated February 13, 2003. Shortly after his birth, C.G.R. was adjudicated a Youth in Need of Care from the bench on June 19, 2003, with the written order dated August 11, 2003. The two older children had been removed from their home in August 2002 when both parents were arrested on illegal drug and weapons charges. The children were placed in kinship foster care with their maternal aunt. The mother of T.R., S.R., and C.G.R. relinquished her parental rights and is no longer involved in this case. T.R., S.R., and C.G.R. currently reside with their maternal aunt and are awaiting adoption.

¶4 Dawn Stuber-Daem, a social worker with the Department of Health and Human Services ("DPHHS"), met with K.M.E. on January 10, 2003, while he was in jail for partner family member assault against the children's mother. Stuber-Daem had prepared a treatment plan for K.M.E., and she discussed it with him at the jail. The primary goals of the treatment

plan were for K.M.E. to obtain and maintain employment; complete parenting classes; maintain a safe and healthy home environment; complete anger management training; obtain a chemical dependency evaluation and follow through with any recommendations; participate in random urinalysis testing; have weekly contact with the social worker; and resolve his pending criminal charges. The treatment plan covered the period from January 10, 2003, until July 7, 2003. However, it was not court-approved until April 11, 2003. Neither this treatment plan nor the two subsequent treatment plans were signed by K.M.E.

¶5 K.M.E. was incarcerated for approximately two weeks in January, and from May 23, 2003, until July 21, 2003. Although both anger management and parenting classes are available through the jail, K.M.E. did not complete them, nor did he provide verification to Stuber-Daem that he had completed any of the treatment plan's tasks during its coverage period. DPHHS offered to pay for a chemical dependency evaluation, and arranged to have it done through Journey Recovery in Billings, but Stuber-Daem never received verification that K.M.E. completed the evaluation, nor did DPHHS receive a bill from Journey Recovery for providing any services to K.M.E.

¶6 In May 2003, C.G.R. was born, and the Department moved to include him in this proceeding. The District Court granted the motion on June 19, 2003. During this time, a second treatment plan was prepared for K.M.E. which contained the same goals and tasks as the first treatment plan. It was court-approved on August 26, 2003, and covered the period from June 9, 2003, to December 31, 2003.

¶7 On July 30, 2003, Stuber-Daem met with K.M.E. and explained that if he wanted to

3

have supervised visitation with his children, he needed to provide three urinalysis tests with negative results, and written verification that he attended three anger management classes. He provided the urinalysis results, but did not provide written verification of his attendance at anger management classes, and visitation was not granted.

¶8 In August, K.M.E. met with Stuber-Daem again, and then ceased to show up for meetings and could not be located. Stuber-Daem learned that K.M.E. had been involved in a shooting and was hiding from the authorities.

¶9 A hearing to determine whether to terminate K.M.E.'s parental rights was held on April 8, 2004. At the hearing, Stuber-Daem testified that in her opinion, K.M.E.'s treatment plans were not successful. She stated that neither K.M.E. nor his court-appointed attorney ever contacted her about his treatment plan or its requirements, and that K.M.E. had no contact with his children during the time that she was involved in the case.

¶10 In August 2003, this case was assigned to social worker Linda Schneider. By that time, K.M.E. had been arrested on probation violations, and was also facing additional criminal charges. On September 30, 2003, Schneider visited K.M.E. in jail to discuss the treatment plan. In January 2004, Schneider again visited K.M.E. in jail. The treatment plan had expired, and Schneider asked K.M.E. if he would consider relinquishing the children. K.M.E. stated that he wanted to care for his children, and Schneider discussed with him the possibility of attempting another treatment plan.

¶11 Schneider drafted a treatment plan to cover the period from January through June 2004. It was substantially the same as the previous two treatment plans except that it also

required K.M.E. to obtain a psychological evaluation. Schneider explained to K.M.E. that it would be beneficial for him to attempt to complete any of the tasks that he could while incarcerated. At the April 2004 hearing, Schneider testified that this was her final meeting with K.M.E., and he did not seem interested in attempting the tasks in the treatment plan, and she saw no evidence that he had changed or would change within a reasonable time. She did not hear from K.M.E. again and did not receive any verification that he completed any of the classes required by either the second or third treatment plans, even though anger management and parenting classes are available at the jail.

¶12 Adam Flores, K.M.E.'s probation officer, testified that several of K.M.E.'s probation conditions coincided with the tasks K.M.E. was supposed to complete for the treatment plans. Flores testified that K.M.E. did not get a chemical dependency evaluation as required, nor did he enroll in or complete anger management classes. Furthermore, he tested positive for illegal drugs on two occasions. Throughout the rest of 2003, K.M.E. was jailed for probation violations and subsequently released on multiple occasions.

¶13 On February 6, 2004, DPHHS petitioned the District Court for permanent legal custody of T.R., S.R., and C.G.R. After hearing evidence on April 8, 2004, the District Court ruled from the bench, concluding that K.M.E. was unfit, unable, or unwilling to parent the children, and that his conduct was unlikely to change in a reasonable time, and ordered his parental rights terminated, with permanent legal custody of T.R., S.R., and C.G.R. awarded to DPHHS with the right to consent to adoption or guardianship. K.M.E. appeals from the resultant Findings of Fact, Conclusions of Law, and Order, signed April 22, 2004.

**STANDARD OF REVIEW**

¶14     In a termination of parental rights case, we review a district court's findings of fact to determine whether they are clearly erroneous. *In re J.M.J.*, 1999 MT 277, ¶ 15, 296 Mont. 510, ¶ 15, 989 P.2d 840, ¶ 15 (citation omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or a review of the record leaves us with the definite and firm conviction that the court made a mistake. *J.M.J.*, ¶ 15 (citation omitted).

¶15     The determination that a termination of parental rights is appropriate is a discretionary ruling which we review for an abuse of discretion. *J.M.J.*, ¶ 16 (citation omitted). The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *J.M.J.*, ¶ 16 (citation omitted).

**DISCUSSION**

¶16     Did the District Court err when it terminated K.M.E.'s parental rights to T.R., S.R., and C.G.R.?

¶17     K.M.E. argues that the District Court misapprehended the evidence presented in this case and thenceforth made incorrect conclusions. Citing to three particular conclusions reached by the District Court, K.M.E. maintains that they are erroneous and constitute an abuse of discretion because DPHHS did not present clear and convincing evidence that K.M.E.'s court-approved treatment plans were appropriate in length and furthermore,

6

DPHHS did not present clear and convincing evidence that DPHHS made a good faith effort to reunify K.M.E. with his children.

¶18   K.M.E. claims that he had no duty to follow any of the treatment plans until they were approved by the District Court. Thus, he argues that the first treatment plan, although given to him on January 10, 2003, and intended to cover the period from January 10, 2003, to July 7, 2003, really did not take effect until the District Court approved it on April 11, 2003, thus giving him only three months to complete a six-month plan. Furthermore, he points out, he was in jail from May 23, 2003, to July 21, 2003, giving him only one month in which to complete the treatment plan, and DPHHS failed to make a good faith effort to provide him with services in jail that would further the reunification process. K.M.E. claims that with the second treatment plan, by the time it was approved by the District Court he had only four months to complete what was supposed to be a six-month treatment plan, and once again he was in jail for two of those four months. With his third treatment plan--given to K.M.E. in January 2004 and intended to cover the period of January 1, 2004, through June 30, 2004--K.M.E. argues that, because he had no duty to follow the plan until it was court-approved, he only had six days to attempt to complete that plan before DPHHS acted to terminate his parental rights. He claims that this further evidences that DPHHS acted in bad faith.

¶19   The State responds that the sum total of K.M.E.'s treatment plans covered a period of seventeen months--from January 10, 2003, to July 7, 2003; from June 9, 2003, to December 31, 2003; and from January 1, 2004, to June 30, 2004--although it concedes that the first plan was not approved by the District Court until April 2003 and the third plan was

7

interrupted by the petition for termination of parental rights filed in February 2004. The State points out that K.M.E. could have begun to comply with the requirements of the first treatment plan as early as January 2003, and that although the termination hearing was not conducted until April 2004, K.M.E. made no efforts to comply with the third treatment plan, either.

¶20 The State further points out that many of the requirements of K.M.E.'s treatment plans coincided with the requirements of his probation, and that his probation officer testified that he made no efforts to comply with the terms of his probation. In particular, the State notes, K.M.E. was required under both his treatment plan and his probation terms to obtain a chemical dependency evaluation, enroll in anger management classes, and test negative for illegal drugs, and he failed in these respects. The State disagrees with K.M.E.'s contention that DPHHS did not make good faith efforts towards reunification, noting that DPHHS attempted to give K.M.E. supervised visits with his children on the conditions that he have three consecutive clean urinalysis tests and written verification that he had attended three anger management classes. Although he provided the three consecutive clean tests, he never provided verification of the anger management classes and as a result, visitation did not occur.

¶21 The State notes that K.M.E. did not sign any of the treatment plans. It further notes that he did sign the releases for information the treatment plans required, but that beyond that, he did not succeed--or even verify that he attempted to accomplish--any of the assigned tasks. Although social workers met with K.M.E. both while he was incarcerated and while

8

he was free, and gave him the opportunity to have a chemical dependency evaluation done while in jail at DPHHS' expense, K.M.E. did not make any efforts towards compliance. He also chose not to participate in the family group decision-making meetings which DPHHS had set up, even while he was out of jail. The State also points out that, in spite of K.M.E.'s contention that his treatment plans were not tailored to suit his ability to complete tasks while in jail, neither K.M.E. nor his court-appointed counsel ever contacted DPHHS to inquire about the treatment plans or their requirements or to request assistance with completing them. Witnesses testified that K.M.E. apparently did not enroll in the parenting classes or the anger management classes that were available to him at the jail.

¶22    In its Findings of Fact, the District Court noted that, while K.M.E.'s attorney argued at the hearing that K.M.E. could not complete the tasks of the treatment plan while he was incarcerated, K.M.E. did not complete the tasks that could have been accomplished while incarcerated, and he did not complete any tasks during the periods in which he was not incarcerated. The District Court concluded that K.M.E. failed to evidence that he had made any significant efforts to even begin to perform the tasks he needed to complete in order to demonstrate that he was interested in parenting his children. The court stated,

> He did not seek employment, attend parenting classes, establish a home, attend anger management classes, obtain a chemical dependency evaluation, maintain contact with the Department, comply with his probation, obtain a psychological evaluation, refrain from using drugs and alcohol when he was not in jail, make any meaningful request to [DPHHS] for assistance, make any consistent, ongoing progression in his parenting abilities, or contact his attorney for assistance.

9

Concluding that K.M.E. had had adequate time to demonstrate progress in his parenting abilities, the District Court further concluded that his failure to complete the treatment plans came not as a result of K.M.E.'s incarceration, but from his failure to address the tasks. The District Court thus concluded that K.M.E.'s conduct and conditions rendered him unfit, unable, or unwilling to parent the children and that his conduct or conditions were unlikely to change within a reasonable time. Section 41-3-609(1)(f)(ii) and § 41-3-609(2), MCA (2003).

¶23 K.M.E. draws our attention to numerous cases in which we have terminated parental rights after the failure of numerous treatment plans over longer spans of time, and asserts that he received fewer treatment plans which covered a shorter period of time, and thus he should have had the benefit of more time and more treatment plans before the decision to terminate his parental rights was made. He notes that in *J.M.J.*, ¶ 26, this Court upheld the termination of parental rights when the appellant mother had four court-approved treatment plans during a twenty-month period. In *In re Custody & Parental Rights of M.A.D.*, 2003 MT 10, 314 Mont. 38, 62 P.3d 717, this Court upheld the termination of parental rights when the appellant mother had had "a series of unsuccessful treatment plans" over the course of eighteen months. In *In re T.A.G.*, 2002 MT 4, 308 Mont. 89, 39 P.3d 686, this Court upheld the termination of parental rights when the appellant father had seven court-approved treatment plans covering a time period of two and one-half years.

¶24 However, K.M.E. fails to note that we also have case law which supports termination of parental rights with fewer treatment plans. In *In re A.E.* (1992), 255 Mont. 56, 840 P.2d

10

572, we affirmed the termination of a mother's parental rights when she failed to comply with two treatment plans.

¶25 More relevant to the case at hand, in *In re D.V.*, 2003 MT 160, 316 Mont. 282, 70 P.3d 1253, we affirmed the termination of a father's parental rights when he failed to complete three treatment plans. In *D.V.*, the father was incarcerated for periods of time during these treatment plans, and he argued that his third treatment plan was inappropriate because the goals included in the plan did not take into consideration the fact that he was in jail and, as a result, some goals--such as securing legal means of support for his family-- could not be met. *D.V.*, ¶ 18. In *D.V.*, we noted that the father made some efforts to comply with some of the tasks in his treatment plan while incarcerated, such as contacting a prospective employer whom he might be able to work for if he was paroled. *D.V.*, ¶ 25. However, we noted that all of the father's treatment plans contained the same goals, and the father--like K.M.E.--did not complete those goals during the time period in which he was not incarcerated. *D.V.*, ¶ 21.

¶26 Furthermore, we note that even in the cases upon which K.M.E. relies, the appellant parents made some efforts toward completing the tasks of their treatment plans. *J.M.J.*, ¶ 24 (appellant mother left abusive relationship, led a sober lifestyle, and took anti-depressive medication); *T.A.G.*, ¶ 9 (appellant father obtained employment, changed friends, completed anger management program, and completed parenting program). On the record before us, it appears that the only progress K.M.E. made on his treatment plans, whether he was in jail or out, was to sign releases and to have three consecutive clean urinalysis tests. Otherwise,

11

he was unwilling to complete even the minimal requirements necessary to obtain supervised visitation with his children while he was out of jail. While it is true that it would have been difficult for K.M.E. to complete his treatment plans while he was incarcerated, it appears that he simply made no effort to complete the tasks while he was out of jail, nor did he verify making any efforts to complete those tasks that he could have addressed while in jail.

¶27 On the basis of the record before us, we conclude that the District Court had ample evidence from which to conclude that K.M.E. was unfit, unable, or unwilling to parent the children and that his conduct or conditions were unlikely to change within a reasonable time. Thus, the District Court was well within its discretion when it concluded that termination of K.M.E.'s parental rights to T.R., S.R., and C.G.R. was appropriate.

## CONCLUSION

¶28    For the foregoing reasons, we affirm the District Court.

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE