DA 24-0352

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 13N

IN THE MATTER OF:

M.N. and M.N.,

    Youths in Need of Care.

APPEAL FROM: District Court of the Eleventh Judicial District.
In and For the County of Flathead, Cause Nos. DN-21-015(A) and
DN-21-016(A)
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Shannon Hathaway, Hathaway Law Group, Missoula, Montana

    For Appellee:

    Austin Knudsen, Montana Attorney General, Katie F. Schulz,
Assistant Attorney General, Helena, Montana

    Travis R. Ahner, Flathead County Attorney, Katie Handley, Deputy
County Attorney, Kalispell, Montana

Submitted on Briefs: January 2, 2025

Decided: January 22, 2025

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 B.M.N. appeals the January 30, 2024 order of the Eleventh Judicial District Court, Flathead County, terminating her parental rights to her twins, M.N. and M.N. We affirm.

¶3 M.N. and M.N. (collectively, the "twins") were born in 2018. On May 18, 2021, the State removed the twins from B.M.N.'s care due to concerns of drug use, domestic violence, B.M.N.'s mental health, and unsafe living conditions. The court adjudicated the twins Youths in Need of Care on June 11, 2021. Following their removal, the twins lived with several licensed foster homes and the court extended temporary legal custody several times between June 11, 2021, and February 10, 2023. On June 18, 2021, the District Court approved a treatment plan to address B.M.N.'s issues related to the twins' removal. The treatment plan required B.M.N. engage in mental health counseling and chemical dependency counseling.

¶4 B.M.N.'s treatment plan also included a series of parenting classes through Family Concepts. While B.M.N. completed these classes, she did not demonstrate consistent progress in her supervised interactions with the twins. The first visit, which occurred two days after removal and was supervised by the Department of Public Health and Human Services (DPHHS) worker who removed the twins from B.M.N.'s care, devolved into an

unmanageable situation in which B.M.N. screamed and berated the DPHHS worker. This was disturbing for the twins. Visitations then began occurring under the supervision of DPHHS Social Service Technicians (SSTs), largely without incident.

¶5 Beginning in July 2021, B.M.N. began having visitations under the supervision of Bear Logic. DPHHS believed that visits facilitated by Bear Logic, which provides real-time parent coaching rather than just safety supervision, would benefit B.M.N. The first two Bear Logic visits proceeded well except for an incident in which B.M.N. raised a hand to strike one of the twins. During the third visit on July 8, 2021, one of the twins needed a diaper change and hid under a table. B.M.N. wanted to change the diaper on the floor but was directed by Bear Logic staff to use the provided changing tables as the more sanitary option. B.M.N. became upset and began cursing staff. She also attempted to film the interaction, in violation of the privacy of other families in the facility. Bear Logic staff asked her to leave. Due to an unrelated incident, police cars were parked outside the facility. When leaving, B.M.N. encountered the police cars and believed that Bear Logic staff had called law enforcement due to her behavior during the visit. Despite reassurances that the police had not been called for her, B.M.N. refused to return to Bear Logic.

¶6 Visitations with the twins resumed under the supervision of DPHHS SSTs. These proceeded productively between July and September 2021. However, in October 2021, B.M.N. missed two scheduled visitations. After missing a third visit scheduled for 4:00 p.m. on October 19, 2021, the SST took the twins to B.M.N. at her mother's home, hoping to find B.M.N. B.M.N. did not answer the door. B.M.N. later texted the SST and

explained that she had fallen asleep. An SST and DPHHS worker then attempted to meet with B.M.N. and her mother to possibly establish visits supervised by the twins' grandmother at the home. During this meeting, B.M.N. became upset and screamed at the SST and the DPHHS worker. Despite this, DPHHS attempted to establish a visitation protocol supervised by the twins' grandmother. However, B.M.N. was unresponsive when DPHHS attempted to follow through on the visitation plan and SSTs resumed supervising visitation in November 2021.

¶7 During the November 2021 visits, B.M.N. was often dysregulated, focusing more on arguing with DPHHS workers than on the twins. B.M.N. struggled with the twins' bathroom accidents and diaper changing. Supervisors noted that she was rough with one of the twins following an accident and encouraged the other to mock the sibling. B.M.N. arrived already escalated for a December 2, 2021 visit. When one of the twins also became upset, B.M.N. roughly and repeatedly forced him into a chair. After the SST intervened, B.M.N. told the children that the State was going to take them away. A Child Protection Specialist Supervisor (CPSS) then took over supervision of the visit, sitting just outside the room to monitor the twins' safety. B.M.N. became upset that the CPSS refused to close the door. B.M.N. then began screaming and crying, causing the children to become upset. B.M.N. screamed obscenities at staff as she left the facility.

¶8 Due to B.M.N.'s behavior at the December 2, 2021 visit, and based on how her behavior had affected the children, visitations resumed under the supervision of Family Concepts on December 10, 2021. Initial visits were productive: B.M.N. was attentive to

4

the twins and responded to redirection, allowing her to progress to semi-supervised visits in early 2022. However, staff suspected that B.M.N. attended a February 2022 visit under the influence of drugs and B.M.N.'s behavior regressed over subsequent visits. Because B.M.N. was more emotionally escalated, less responsive to staff coaching, and unable to maintain the safety of the children, visits were reduced from 3.5 to 2.5 hours. Despite regaining some progress by the end of March 2022, B.M.N. became very dysregulated during an April 6, 2022 visit and visits were suspended until B.M.N. agreed to abide by Family Concepts' guidelines on April 26, 2022. Still, by June 2022, B.M.N. was once again uncoachable and dysregulated, resulting in her discharge from Family Concepts.

¶9 Visitations were then referred to the Yellowstone Boys and Girls Ranch (YBGR), but B.M.N. failed to meaningfully participate in the preliminary intake process in early July 2022. B.M.N. eventually completed the intake process and visits with the twins resumed on July 26, 2022. Again, initial visits proceeded well but declined in early August. B.M.N. struggled with compliance with paperwork and behavioral expectations, becoming dysregulated and cursing staff. During this period, the twins began having "regressive behaviors," including issues with potty training and "extreme" emotional dysregulation after visits with B.M.N., complicating their transitions back to the foster home. At an August 26, 2022 status hearing, a DPHHS caseworker testified that B.M.N. had stopped attending mental health and chemical dependency counseling. B.M.N. explained, "They took my visits away, I quit jumping through their hoops." After several meetings to

reiterate expectations failed to change B.M.N.'s behavior, YBGR formally discharged B.M.N. in October 2022.

¶10 Because B.M.N. had exhausted all visitation providers in the area, virtual visitations returned to DPHHS supervision in December 2022. As these proceeded without incident, in-person visitations resumed in January 2023. However, B.M.N. began whispering misleading messages to the twins about the reality of their situation and potential for reunification, causing them to escalate and struggle with transitioning back to the foster home. DPHHS then suspended in-person visits in favor of virtual visits.

¶11 Concurrent to her struggle with parenting the twins, B.M.N. struggled with active cannabis and methamphetamine dependencies. DPHHS required B.M.N. submit to drug tests. B.M.N. took seven urinalysis tests between May 2021 and February 2022. All seven were positive for cannabis. Two of the urinalysis tests, taken on May 20, 2021, and February 4, 2022, also tested positive for methamphetamine. B.M.N. briefly engaged in chemical dependency counseling but stopped in May 2022 and never tested consistently as required. DPHHS was unaware of any chemical dependency treatments engaged in by B.M.N. in the year and a half preceding the order to terminate her parental rights.

¶12 Similarly, B.M.N. completed multiple mental health evaluations, but only briefly participated in counseling sessions early in the process. B.M.N. did not engage in further counseling as provided for in the treatment plan. B.M.N. thus continued to exhibit behaviors which prevented her from productively working with DPHHS in the parent visitation plan.

¶13     Because B.M.N. had failed to make progress with her court-ordered treatment plan, DPHHS petitioned to terminate B.M.N.'s parental rights on June 9, 2023. At the January 30, 2024 termination hearing, B.M.N. contested the termination but presented no evidence on her own behalf. The District Court terminated B.M.N.'s parental rights to the twins on January 30, 2024, granting DPHHS permanent legal custody.

¶14     On appeal, B.M.N. argues that DPHHS failed to provide reasonable efforts to reunite B.M.N. and the twins and that the District Court erred in determining that B.M.N.'s conduct was unlikely to change within a reasonable time.

¶15     A district court's decision to terminate parental rights is reviewed for an abuse of discretion. *In re J.B., Jr.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715 (citation omitted). "We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re M.N.*, 2011 MT 245, ¶ 14, 362 Mont. 186, 261 P.3d 1047 (quotation omitted).

¶16     A court may order termination of parental rights based upon a finding established by clear and convincing evidence that the parent of the "youth in need of care" has failed to comply with or demonstrate success in "an appropriate treatment plan that has been approved by the court" and "the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA. When determining whether the conduct or condition of the parent is unlikely to change within a reasonable time, "the court shall enter a finding that continuation of the parent-child legal

relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care." Section 41-3-609(2), MCA. To arrive at this conclusion, the court must consider whether the "mental illness . . . of the parent [is] of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time" and whether there is "excessive use of . . . [a] dangerous drug that affects the parent's ability to care and provide for the child." Sections 41-3-609(2)(a), (c), MCA. DPHHS "shall make reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families that have been separated by the state." Section 41-3-423(1)(a), MCA. Reasonable efforts "do not require herculean efforts[.]" *In re R.J.F.*, 2019 MT 113, ¶ 37, 395 Mont. 454, 443 P.3d 387. "Engaging in reasonable efforts requires the development and implementation of voluntary services and/or a treatment plan reasonably designed to address the parent's treatment and other needs precluding the parent from safely parenting." *In re R.J.F.*, ¶ 37. We have long held that a parent has an obligation to avail themselves of services arranged or referred by the DPHHS and to engage with the department to successfully complete their treatment plan. *In re R.J.F.*, ¶ 38 (citing *In re C.B.*, 2014 MT 4, ¶¶ 19, 23, 373 Mont. 204, 316 P.3d 177; *In re D.F.*, 2007 MT 147, ¶ 29, 377 Mont. 461, 161 P.3d 825; *In re T.R.*, 2004 MT 388, ¶ 26, 325 Mont. 125, 104 P.3d 439; *In re L.S.*, 2003 MT 12, ¶ 11, 314 Mont. 42, 63 P.3d 497).

¶17 Here, in the two and half years between the twins' removal from B.M.N.'s home and when the District Court terminated B.M.N.'s parental rights, B.M.N. failed to comply with her treatment plan despite the reasonable efforts of DPHHS. B.M.N. exhausted local visit supervision services. Her participation in these programs followed difficult cycles of compliance and resistance. Concurrently, she failed to engage in mental health counseling and chemical dependency counseling. Her interactions with DPHHS and other entities attempting to facilitate family reunification were frequently marked by emotional dysregulation leading to escalated outbursts toward the twins and staff. B.M.N. does not contest the factual findings in the District Court's order terminating her parental rights and did not offer testimony to contradict the evidence of her inability to meaningfully participate in her treatment plan. Thus, we conclude that the District Court did not abuse its discretion in finding that DPHHS made reasonable efforts to reunify B.M.N. and the twins.

¶18 We turn next to B.M.N.'s second argument that the District Court erred in determining she was unlikely to change her behavior within a reasonable amount of time. When applying the criteria for termination provided by § 41-3-609, MCA, the question "is not merely whether a parent has made progress or would make some progress in the future, but whether the parent is likely to make enough progress within a reasonable time to overcome the circumstances rendering [them] unfit to parent." *In re A.B.*, 2020 MT 64, ¶ 27, 399 Mont. 219, 460 P.3d 405 (citations omitted). "To determine whether the conduct

or condition is likely to change, the court is required to assess past and present conduct of the parent." *In re A.B.*, ¶ 27 (quotation omitted).

¶19 Here, B.M.N.'s inability to comply with the prescribed treatment plan has resulted in her continued issues with mental health and chemical dependency. B.M.N. has been unable to cease using cannabis during this time, as demonstrated by the irregular drug tests and producing positive tests for cannabis. Additionally, B.M.N. twice tested positive for methamphetamine during this period. Despite these acknowledged chemical dependencies, B.M.N. failed to participate in counseling to mitigate her dependency issues. There was clear and convincing evidence of B.M.N.'s persistent abuse of chemical substances, of her ongoing unwillingness to engage with mental health services that were provided to her, and of her inability to safely and appropriately engage in supervised visitation for over two years. The District Court's conclusion that B.M.N. was unable to change the conduct and conditions which led to the removal of the twins within a reasonable time was supported by substantial evidence.

¶20 Upon our review of the record, we conclude that the District Court did not abuse its discretion in terminating B.M.N.'s parental rights. Accordingly, the judgment of the District Court is affirmed.

¶21 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

/S/ LAURIE McKINNON


We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE