FILED

06/23/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0566

DA 25-0566

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 133

IN THE MATTER OF:

M.F.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDN-2023-65
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Allen P. Lanning, Law Office of Allen P. Lanning, PC, Great Falls, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Michael Dougherty, Assistant Attorney General, Helena, Montana

        Kevin Downs, Lewis and Clark County Attorney, Christine Zadra, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  April 1, 2026

Decided:  June 23, 2026

Filed:

           _____
                      Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 L.R.H. (Mother) appeals from the termination of her parental rights to M.F. issued July 23, 2025, by the First Judicial District Court, Lewis and Clark County.[1] We affirm.

¶2 We restate the issues on appeal as follows:

1. *Whether the Department engaged in reasonable efforts to prevent removal of M.F. and to reunite Mother with M.F.*

2. *Whether the District Court erred in not finding guardianship to be the preferred permanency option and not denying the Petition for Termination.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Prior to this case, the Montana Department of Health and Human Services, Child and Family Services Division (Department) had a history of prior investigations and intervention with this family centering on exposing M.F. to illegal drug use and inappropriate individuals. This was M.F.'s fourth removal by the Department.

¶4 On October 11, 2023, the Department brought this action asserting physical neglect of M.F. and seeking emergency protective services (EPS), adjudication, and temporary legal custody. On October 19, 2023, the District Court held an EPS hearing. CPS Laird testified the Department became involved when U.S. Marshals went to Mother's residence to arrest a probation absconder and, while there, they discovered steroids in Mother's bedroom and a blow torch. The Department began an investigation in which it collaborated with law enforcement, interviewed collateral sources, and attempted to locate Mother and

---

[1] In approximately 2020, Father was arrested, charged, and convicted of distribution of dangerous drugs and is currently incarcerated in federal prison. Father's parental rights to M.F. were terminated at the same time as Mother's and he has not appealed the termination.

M.F. CPS Laird testified as to continuing concerns after meeting with M.F., including M.F.'s fear at her home of people banging on the door in the middle of the night; her lack of educational advancement;[2] concerns regarding Mother's substance use with her failure to initially take a drug test and then a few days later testing positive for methamphetamines, amphetamines, and THC; and ongoing concern of a pervasive pattern of substance use that Mother had not addressed. Mother contested there was probable cause to continue M.F.'s removal from her care. The District Court determined, based on the totality of the circumstances, they amply established probable cause to believe that M.F. was abused or neglected, or in danger of being abused or neglected; thus, there was probable cause to continue her removal. CPS Laird then advised the court Mother was receiving near daily visits—which would have to be modified when M.F. got enrolled in school. She also advised that the Department was looking into potential kinship placements but did not yet have sufficient information to determine those options.

¶5 At the show cause hearing on October 26, 2023, Mother withdrew her contest to show cause and the parties discussed holding an earlier adjudication hearing so that services could be implemented sooner. The District Court advised that the Department could develop a treatment plan and Mother could participate with treatment plan tasks on a voluntary basis prior to adjudication.

---

[2] Mother had unenrolled M.F. in public education and was home schooling her. At the time of removal, M.F. was academically delayed—she was unable to tell time digitally or on a regular clock, did not know the days of the week, and was unable to read.

3

¶6     The District Court commenced the adjudication hearing on January 8, 2024. CPS Carr testified she had worked with Mother and her attorney to develop a voluntary task list to include a chemical dependency evaluation, a mental health evaluation, and UA testing for substances, and that Mother was scheduled for those evaluations in two days. CPS Carr further testified Mother had been inconsistent with UA testing but within the last couple of weeks had been testing with the Department. She averred that M.F. had a hair follicle test which was positive for methamphetamine—her third such positive test throughout her history with the Department. CPS Carr also testified to the active efforts made since M.F.'s removal to include: CPS Carr communicating with Mother on a near daily basis; jointly developing a voluntary task plan with Mother and her attorney; assisting Mother with referrals; providing two, two-hour visits with M.F. per week; providing M.F. with individual therapy with hope that Mother would be able to join for family therapy at some point; obtaining an assessment with Family Outreach regarding M.F.'s development; offering Mother various options as to drug testing; speaking with various family members, both in and out of state, to try to identify potential placements; and contacting Indian tribes to request verification as to whether M.F. was enrolled or enrollable. She also expressed a plan for Mother completing parenting classes in the future. The adjudication hearing reconvened on January 11, 2024, for testimony of an Indian Child Welfare Act (ICWA) qualified expert witness (QEW), Anna Marie White. QEW White, without objection or challenge by Mother, testified that the Department had made active efforts[3] to provide

_____

[3] In cases involving rights over Indian children, federal obligations are imposed on the State pursuant to ICWA. 25 U.S.C. § 1912. Congress enacted ICWA to protect and preserve Indian

4

services and programs designed to prevent the breakup of the family and, given the circumstances, it would have been very difficult to do anything but remove M.F. from Mother's care. She also testified that return to the home without intervention would risk serious physical or mental damage. Thereafter, the District Court noted that Mother stipulated to adjudication—which Mother did not challenge in any manner. The District Court then adjudicated M.F. as a Youth in Need of Care (YINC) and found the Department's active efforts to prevent the breakup of the family and to facilitate return had so far been unsuccessful such that return of M.F. to Mother's care would risk serious physical or mental damage. Mother did not object to the District Court's finding of active efforts or raise any claim that the Department had failed to engage in active or reasonable efforts to avoid removal or to facilitate reunification with Mother.

---

culture and curtail the high rate of non-tribal agencies' breakup of Indian families. *See* 25 U.S.C. § 1902. ICWA sets minimum federal standards that must be followed by state courts including the requirement to engage in "active efforts" to "provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" in order to effectuate a foster care placement or termination of parental rights to an Indian child. 25 U.S.C. § 1912(d). Under this standard, the State must do more than simply give a parent a treatment plan and wait for the parent to complete it; § 1912(d) implies heightened requirements compared to those applicable to non-Indian children. *In re J.S.*, 2014 MT 79, ¶ 25, 374 Mont. 329, 321 P.3d 103. Prior to determining M.F. was not an Indian child as defined under ICWA, the District Court and the Department treated the case as requiring the ICWA protections of active efforts.

The 2023 legislative changes to Montana's Child Abuse and Neglect Act, discussed further below, substantially revised the definition of reasonable efforts from requiring good faith development of treatment plans, voluntary service agreements, and assistance in completing such, to requiring a much more detailed, proactive, family-centered set of actions. These revisions were colloquially dubbed "ICWA for all" as they were more in line with the heightened "active efforts" required under ICWA. As M.F. is not an Indian child, ICWA does not apply and we review the Department's efforts under § 41-3-423(1), MCA (2023).

¶7 At the treatment plan hearing on February 22, 2024, Mother's counsel advised the court that she and Mother had gone over the treatment plan together and Mother had just signed it. The court adopted and approved the treatment plan signed by Mother.

¶8 Mother underwent a chemical dependency evaluation with Helena Valley Addiction Services (HVAS) which indicated a need for intensive outpatient treatment (IOP). She was started in IOP but because of positive testing for methamphetamine, cocaine, and fentanyl, it was determined Mother needed a higher level of care such that inpatient treatment was recommended. Arrangements were made for Mother to undergo 30-day inpatient treatment at Badlands Treatment Center in April 2024. Mother, however, did not accept treatment at Badlands at this time due to a dental procedure.

¶9 A status hearing was held May 2, 2024, at which time it was reported that Mother had been engaging in IOP for the last few months and was planning to participate in inpatient treatment at Recovery Center of Montana (RCM) starting May 7, 2024. However, Mother ultimately did not accept the inpatient treatment bed date at RCM. When pushed by HVAS to attend inpatient treatment, although physically present, Mother became disengaged with treatment. In early May 2024, shortly after the status hearing, Mother stopped attending IOP at HVAS.

¶10 The District Court held a status and extension of legal custody hearing on June 27, 2024, at which Mother agreed to extension of temporary legal custody. At that time QEW White testified that the Department was making active efforts to reunify M.F. with Mother, but that return of M.F. to Mother's care would likely result in serious emotional or physical damage. She based this opinion on Mother's variable engagement; although Mother

6

periodically made progress, those periods were followed by relapses and disengagement, as reflected by Mother's positive drug tests, her arrest for DUI, and her failure to maintain a safe and stable home. CPS Carr testified that Mother had not consistently maintained sobriety or engaged in services. She had referred Mother to several resources and services to address her chemical dependency and mental health needs and tried to encourage and support her to participate and engage but Mother had not been consistent. She also testified to having commenced an Interstate Compact on the Placement of Children (ICPC) for potential placement of M.F. with her sister, D.C. Mother did not assert there were any services she needed that were not being offered and did not raise any claim or challenge that the Department was not engaging in active or reasonable efforts designed to reunify her with M.F.

¶11 At the status hearing on August 1, 2024, CPS Carr testified that things were not going well from the Department's perspective. CPS Carr explained: Mother was no longer communicating with her; since the last hearing, Mother had two more chemical dependency evaluations—one with Montana Counseling Services and one with Stevi Scott—but had not followed the recommendations of either evaluation; an ICPC had been submitted for potential placement of M.F. with her sister in Nevada; and due to Mother's unpredictable, erratic behaviors, visitation had been moved back to the Department's offices. Mother's counsel advised that Mother was having some dental issues and had not had opportunity to follow up on chemical dependency recommendations, and that she

would be drug testing with Helena Indian Alliance through Stevi Scott.[4]  Again, Mother did not assert the Department was not engaging in active or reasonable efforts to reunite her with M.F. and did not request any additional services or actions from the Department that she needed to successfully complete her treatment plan.

¶12    The District Court held a status hearing on September 12, 2024.  CPS Carr testified that the ICPC she had submitted was denied as M.F.'s sister did not follow through to complete the paperwork in Nevada, and that she was determining what would need to be done to resubmit the ICPC.  She further testified she had referred Mother back to Community Solutions for drug testing, but she had not engaged.  Mother had undergone the two additional chemical dependency evaluations (four thus far in the case) with Montana Counseling Services and Stevi Scott—both of whom had recommended inpatient treatment—but Mother had not engaged in any treatment yet.  Following the evaluations, CPS Carr explained she had focused her efforts on getting Mother to follow through with the evaluators' recommendations.

¶13    At the October 3, 2024 status hearing, Mother's counsel advised that Mother was not doing chemical dependency treatment; although she had gone to one IOP treatment session, she had been recently arrested and was in jail.  CPS Carr advised that prior to Mother being arrested, she had a conversation with Mother about getting Mother into treatment and explained that the Department could provide Mother with assistance to pay

_____

[4] Counsel advised Mother had been testing through Drug Information Systems but acknowledged the Department contested the validity of those tests as they were not random and it was unknown what substances were being tested for.

for gas to get there. CPS Carr also expressed she was happy to set Mother up with a licensed addiction counselor at the jail or other providers to go to the jail for evaluation or services if Mother was going to be incarcerated for a while.

¶14 At the status hearing on November 7, 2024, it was reported that while Mother had signed up with Montana Counseling Services, she had missed appointments, showed up late, and was not attending group sessions. It was also reported that Mother failed to consistently engage in drug testing, and on the occasions she had engaged, she tested positive. Mother, however, contested the accuracy of the drug tests. It was also discussed that the current recommendation for Mother was to participate in inpatient treatment, which Mother said she was still considering.

¶15 On December 13, 2024, the Department filed its petition for termination of Mother's parental rights.

¶16 At the termination hearing commencing June 13, 2025, it was learned that Mother completed inpatient treatment at RCM, discharging in early May 2025. However, within two weeks of her discharge, Mother was observed drinking alcohol in a bar. Additionally, since her discharge, Mother had failed to follow through with outpatient services as recommended.

¶17 Throughout the pendency of this case, CPS Carr testified in depth as to the active and reasonable efforts provided which included:

- Reviewing prior CPS history of substantiated reports of abuse or neglect.

- Investigating a current confidential informant report and law enforcement report.

9

- At the outset of the case, attempting to locate Mother and M.F. and identify potential kinship placements by going to Mother's residence, collaborating with law enforcement, and seeking information from M.F.'s prior grade school, Rossiter Elementary.

- Upon locating Mother and M.F., obtaining information from each as to their circumstances.

- Investigating the circumstances of both Mother and M.F. by going to Mother's residence, collaborating with law enforcement and Probation and Parole, and seeking information from collateral source interviews of individuals who had been in Mother's residence and witnessed the home environment.

- Jointly developing with Mother and her attorney a voluntary task plan so that Mother could access and begin participating in services to address the conduct and conditions making her unable to safely parent, rather than waiting for a treatment plan to be approved, resulting in chemical dependency and mental health evaluations being scheduled before adjudication.

- Investigating into whether M.F. was an Indian child as defined by ICWA, and ultimately verifying that M.F. was not an Indian child.

- Sending letters to any and all identified family members after a SENECA search, receiving some responses but no interest in being placement unless parental rights were terminated.

- Placing M.F. in a safe, stable foster home.

- Pursuing ICPC for potential placement of M.F. with her sister, D.C., in Nevada.

- Establishing near daily visitation at the outset of the case and continuing with two, two-hour weekly visits once M.F. started attending school.

- Providing a visitation specialist to assist with visits and provide guidance to ameliorate inappropriate conduct with the goal of progressing to unsupervised visitation.

- Completing a comprehensive assessment of child's family circumstances, including any barriers to accessing and engaging in services.

- Completing an educational development assessment for M.F. with Family Outreach to identify any areas of educational or developmental concern.

- Implementing a child interaction plan with regard to visits to improve M.F. and Mother's bonds and strengthen their relationship.

- Providing individual therapy to M.F.

- Referring and assisting Mother in obtaining chemical dependency and mental health evaluations.

- Working with Mother to secure four chemical dependency evaluations, treatment with HVAS, inpatient treatment bed dates, and treatment with Montana Counseling Services over a couple of periods, leading to ongoing one-on-one counseling and inpatient treatment at RCM.

- Developing Mother's treatment plan, which identified several needs including parenting skills, chemical dependency, mental health, safe housing, and her involvement with the criminal justice system.

- Identifying and referring Mother to services, including services for mental health, substance abuse, and peer support; specifically referring Mother to Helena Indian Alliance, Helena Valley Addictions, inpatient facilities, Coleman Community Solutions, Community Solutions for testing, and offering information on other available resources to assist with mental health and chemical dependency needs.

- Arranging drug testing.

- Engaging in extensive conversations with providers trying to elaborate on the best ways to support Mother to engage in treatment services.

- Facilitating family engagement meetings, permanency planning, and treatment meetings.

- Regularly meeting with Mother to discuss her progress regarding the treatment plan and assisting Mother in accessing services, maintaining tasks, and engaging in services necessary to reunify with M.F.—with primary concern for addressing her chemical dependency and mental health issues.

- Providing Mother gas cards for assistance in attending treatment.

- Offering to arrange for addiction counseling or other services to Mother while incarcerated.

¶18 At the termination hearing, CPS Carr again testified to and reiterated many of the efforts made by the Department to reunify Mother and M.F. During the hearing, the District Court questioned CPS Carr as to what considerations were given to pursuing a guardianship rather than a termination. The District Court also questioned the CASA appointed to the case, Debbie Whedbee, seeking her input as to whether she believed termination as opposed to a guardianship was in M.F.'s best interests. CASA Whedbee related that M.F. was anxious and fearful of residing with Mother and wanted to remain in her current placement as it was safe with no "bad people" coming around. Given M.F.'s substantial need for assurances regarding her safety, and because permanent placement would be accompanied by the foster mother's agreement to maintain some contact/relationship with M.F.'s birth family, CASA Whedbee believed termination was in M.F.'s best interests.

¶19 At the close of the termination hearing, the parties presented oral argument summarizing their positions. Mother's counsel did not argue or claim the Department failed to provide reasonable efforts to reunify Mother with M.F., or that any deficiency of efforts by the Department resulted in Mother not being able to change the conduct or condition making her unfit to parent within a reasonable period. Instead, counsel argued Mother made progress on her treatment plan, completing two parenting classes and two mental health evaluations, successfully completing inpatient treatment at RCM, and making her visits. Counsel credited Mother for getting her criminal child endangerment charge dropped and maintaining contact with the Department through the life of the case. Counsel asserted not that the Department failed to provide reasonable efforts or that the

District Court should order guardianship rather than termination, but instead that the concerns for safety which caused the Department to become involved in October 2023 had been alleviated.

**STANDARD OF REVIEW**

¶20 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. *In re A.S.*, 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848; *In re K.A.*, 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478. The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination has been satisfied. *In re K.L.*, 2014 MT 28, ¶ 14, 373 Mont. 421, 318 P.3d 691. In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing. *In re K.L.*, ¶ 14. This Court reviews a district court's findings of fact for clear error and conclusions of law for correctness. *In re M.V.R.*, 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made." *In re J.B.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715. "To reverse a district court's evidentiary ruling for an abuse of discretion, this Court must determine the district court either acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *In re I.M.*, 2018 MT 61, ¶ 13, 391 Mont. 42, 414 P.3d 797.

## DISCUSSION

¶21    1. *Whether the Department engaged in reasonable efforts to prevent removal of M.F. and to reunite Mother with M.F.*

¶22    Mother asserts § 41-3-423(1), MCA, requires the Department in good faith to make reasonable efforts to reunify her and M.F.  She contends that the District Court failed to make specific findings that the Department undertook the statutorily required reunification efforts or that the Department acted in good faith.  Mother contends there was insufficient evidence presented at the termination hearing for the District Court to make the requisite reasonable efforts finding.

¶23    Mother argues the Legislature's 2023 enactments amending, replacing, and supplementing Montana's Child Abuse and Neglect Act, enacted shortly before the commencement of this case, make "this Court's precedent from a time where 'reasonable efforts' were a subjective standard to be determined on a case-by-case basis [] not appropriately relevant to post-2023 Department responsibilities, which are objectively and specifically defined."

¶24    Contrarily, the Department asserts the legislative changes to Montana's Child Abuse and Neglect Act do not make this Court's "reasonable efforts" precedent irrelevant.  The Department sought termination of Mother's parental rights pursuant to § 41-3-609, MCA—M.F. was adjudicated a YINC, an appropriate treatment plan approved by the court had not been successful, and Mother's conduct or condition rendering her unfit was unlikely to change within a reasonable time.  The Department accurately asserts § 41-3-609, MCA, has no specific requirement with regard to reasonable efforts and that, consistent with

15

*In re R.J.F.*, 2019 MT 113, ¶ 26, 395 Mont. 454, 443 P.3d 387, this Court has found that consideration of the Department's efforts is relevant to the extent that a lack of appropriate efforts may influence the determination as to whether the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

¶25 In termination proceedings, § 41-3-609(1)(f), MCA, protects a parent's fundamental right to the care and custody of a child. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. A district court may only terminate the parent-child relationship of an adjudicated YINC if it finds "by clear and convincing evidence" that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA.

¶26 Since "a natural parent's right to [the] care and custody of a child is a fundamental liberty interest," a district court "must adequately address each applicable statutory requirement" before terminating an individual's parental rights. *In re A.T.*, 2003 MT 154, ¶ 10, 316 Mont. 255, 70 P.3d 1247. One such requirement is found in § 41-3-423(1), MCA, which provides in pertinent part:

> (a) The department shall make reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families that have been separated by the state.
>
> (b) For the purposes of this subsection (1), the term "reasonable efforts" means the department shall in good faith:
>
> > (i) *conduct a comprehensive assessment of the circumstances of the family, with a focus on safe reunification as the most desirable goal. The assessment must be provided to the parents and to counsel for the parents.*

(ii) identify appropriate services and *help the parents overcome barriers, including actively assisting the parents in obtaining appropriate services*;

(iii) with parental consent, *identify and invite the extended family to participate in providing support and services to the family and to participate in family team meetings, permanency planning, and resolution of placement issues*;

(iv) conduct or cause to be conducted a diligent search for the child's extended family members and *contact and consult with extended family members to provide family structure and support for the child and the parents*;

(v) *offer and employ all available and culturally appropriate family* preservation strategies and facilitate the use of remedial and rehabilitative services;

(vi) take steps to keep siblings together whenever possible;

(vii) support regular visits with parents in the most natural setting possible, as well as *trial home visits with the child during any period of removal*, consistent with the need to ensure the health, safety, and welfare of the child;

(viii) identify community resources, including housing, *financial*, transportation, mental health, substance abuse, and peer support services, and actively assist the parents or, when appropriate, the child's family in utilizing and accessing the resources;

(ix) monitor progress and participation in services; and

(x) *consider alternative ways to address the needs of the parents and, when appropriate, the family* if the optimum services do not exist or are not available.

Section 41-3-423(1), MCA (emphasis added to the portions Mother asserts the Department provided no evidence of at the termination, which will be discussed below). While the

17

2023 legislative changes more particularly describe reasonable efforts, they do not specifically make reasonable efforts a separate requirement for termination.

¶27 Although determination of whether the Department made reasonable efforts is not a separate requirement for termination, it may be a predicate for finding that the conduct or condition rendering a parent unfit, unwilling, or unable to parent is unlikely to change within a reasonable time—one of the factors required for termination of a parent's rights. *In re R.J.F.*, ¶ 26; *see also* § 41-3-609(1)(f)(ii), MCA; *In re D.B.*, ¶ 25. With regard to the termination of parental rights, the analysis of reasonable efforts is highly fact-dependent. *In re R.J.F*, ¶ 27.

¶28 To meet its requirements to provide reasonable efforts, the Department must in good faith develop and implement treatment plans designed "to preserve the parent-child relationship and the family unit." *In re R.J.F.*, ¶ 28 (citation omitted); *see also In re T.D.H.*, 2015 MT 244, ¶ 42, 380 Mont. 401, 356 P.3d 457; *In re D.B.*, ¶ 33; Procedure - Case Management, Child and Family Services Division (DPHHS 2022), https://perma.cc/ZYX7-CN3Q. Additionally, the Department must, in good faith, assist a parent in completing her treatment plan. *In re R.J.F.*, ¶ 28; *In re T.D.H.*, ¶ 42; *In re D.B.*, ¶ 33; Procedure - Case Management, Child and Family Services Division (DPHHS 2022), https://perma.cc/ZYX7-CN3Q.

¶29 We have long held that a parent has an obligation to avail herself of services arranged or referred by the Department and to engage with the Department to successfully complete her treatment plan. *In re R.J.F.*, ¶ 28; *In re C.B.*, 2014 MT 4, ¶¶ 19, 23, 373 Mont. 204, 316 P.3d 177; *In re D.F.,* 2007 MT 147, ¶ 30, 337 Mont. 461, 161 P.3d 825;

*In re T.R.*, 2004 MT 388, ¶ 26, 325 Mont. 125, 104 P.3d 439; *In re L.S.*, 2003 MT 12, ¶ 11, 314 Mont. 42, 63 P.3d 497. This Court has consistently held that Montana law requires the Department to make *reasonable* efforts to reunite parents with their children, not herculean efforts. *In re R.J.F.*, ¶ 28; *In re A.G.*, 2016 MT 203, ¶ 17, 384 Mont. 361, 378 P.3d 1177.

¶30 From our review of the record, we conclude the District Court did not err in determining the Department provided reasonable efforts as required by § 41-3-423(1), MCA.

¶31 Mother asserts the Department provided no evidence at the termination hearing that it complied with the italicized portions set forth in § 41-3-423(1), MCA, above. But this claim ignores the substantial evidence provided throughout the proceedings demonstrating the Department's reasonable efforts. Early on in this case, the Department completed a comprehensive assessment of the circumstances of the family, including review of CPS history, Mother's chemical dependency and mental health issues, and completing an educational development assessment for M.F. with Family Outreach to identify any areas of educational or developmental concern. These efforts satisfy § 41-3-423(1)(b)(i), MCA.

¶32 Throughout the case, CPS Carr jointly worked with Mother to develop a voluntary service plan so that Mother could engage immediately with services rather than wait for the court to approve a treatment plan. CPS Carr made referrals and assisted Mother in obtaining chemical dependency and mental health evaluations; identified and referred Mother to services including mental health, substance abuse, and peer support; referred Mother to Helena Indian Alliance, Helena Valley Addictions, inpatient facilities, Coleman

Community Solutions, Community Solutions for testing; offered information on other available resources to assist with mental health and chemical dependency needs; assured Mother completed parenting classes to address parenting skills; engaged with providers to try to elaborate on the best ways to support Mother to engage in treatment services; and regularly met with Mother to discuss her progress with regard to the treatment plan and to assist her in accessing services, maintaining tasks, and engaging in services necessary to reunify with M.F.—with primary concern for addressing her chemical dependency and mental health issues. These efforts satisfy § 41-3-423(1)(b)(ii), (viii) and (x), MCA.

¶33 Further, the Department made a SENECA search to identify potential kinship placements, sent letters to potential kinship placements, submitted an ICPC to pursue potential placement of M.F. with her sister in Nevada, conducted family engagement meetings, and engaged in permanency planning, satisfying § 41-3-423(1)(b)(iii) and (iv), MCA.

¶34 The Department investigated M.F.'s heritage to determine if she was an Indian child, ultimately concluding she was not. CPS Carr obtained information from Mother and M.F. and over time formed a relationship with them. CPS Carr did not identify any unique cultural issues nor did Mother identify or claim any. These efforts satisfy § 41-3-423(1)(b)(v), MCA. The Department also provided Mother financial assistance for transportation to attend treatment which in part satisfies § 41-3-423(1)(b)(viii), MCA.

¶35 Mother specifically asserts the Department did not meet § 41-3-423(1)(b)(vii), MCA, as it did not provide a trial home visit. The Department provided Mother near daily visits at the outset of the case and, throughout the case, provided a visitation specialist to

20

guide Mother's parenting toward deeper development of her parent-child relationship with M.F. and to progress to unsupervised visits. However, Mother failed to engage in treatment and continued to exhibit unpredictable behavior with poor decision making such that it was not appropriate to graduate to unsupervised visits, let alone a trial home visit. These efforts by the Department satisfy § 41-3-423(1)(b)(vii), MCA, which cannot be read to require a trial home visit when the parent has failed to address the conditions which make the parent unsafe to parent the child in her home.

¶36 Engaging in reasonable efforts requires the Department to diligently attempt to contact reluctant parents and engage them with services. Engaging in reasonable efforts also requires the development and implementation of voluntary services and/or a treatment plan reasonably designed to address the parent's treatment and other needs precluding the parent from safely parenting. Further, engaging in reasonable efforts requires more than merely suggesting services to a parent and waiting for the parent to then arrange those services for herself. The means by which the Department prescribed Mother aimed to address her parenting deficiencies—referring and assisting Mother in obtaining mental health counseling and substance abuse treatment in her town of residence; placing M.F. where Mother could exercise frequent and ongoing contact with M.F. along with guidance from a visitation specialist; providing family engagement meetings; providing M.F. therapy and educational opportunity; and providing Mother a CPS worker to be available for regular contact and assistance—and would have, if fully engaged in by Mother, realistically addressed Mother's deficiencies while maintaining and improving her relationship with M.F. Instead, Mother resisted engagement in treatment throughout most

21

of the case. Rather than engage with the chemical dependency and mental health evaluation recommendations, Mother persisted in denying use of illicit drugs and blamed secondary exposure or inaccurate testing for her positive drug tests.

¶37 Mother did not meaningfully engage until the Department sought termination and, after completing some IOP and inpatient treatment, Mother relapsed. Thereafter, Mother never re-engaged with treatment. Mother was, throughout the entirety of the case, in the pre-contemplative stage of change; she was not being honest about her substance use, being resistant to attending treatment, not demonstrating abstinence through regular and random drug testing, and not demonstrating insight into her addiction or its negative impact on M.F. Rather than admit to using, Mother consistently disputed positive drug tests, asserting unreliability of the testing agency or passive exposure unsupported by any competent expert testimony. As noted by the District Court, "these types of implausible excuses are common in drug addicted individuals who have not progressed far in treatment." Mother's reluctance or inability to accept her substance abuse issues and engage with treatment does not constitute failure on the Department's part to provide reasonable efforts. What constitutes reasonable efforts is not static or determined in a vacuum, but rather is dependent on the factual circumstances of each case—the totality of the circumstances— including a parent's resistance and/or inability to, for whatever reason, acknowledge the conditions which make the parent unfit to parent and work collaboratively with the Department to address those conditions.

¶38 Here, based on our review of the record, the District Court did not abuse its discretion in finding the Department engaged in reasonable efforts to reunify Mother with

M.F. This was the fourth removal of M.F. related primarily to issues with Mother's substance abuse. Mother still appears to vacillate between pre-contemplation (no recognition of a problem) and contemplation (recognition of a problem but ambivalence to change) stages of change, despite the Department's interventions and efforts such that even if she were to now fully engage in treatment, her substance use issue could not be addressed in an acceptable timeframe for permanency. Given the prior CPS history, the lack of meaningful change by Mother supports a determination that the condition or conduct rendering Mother unfit to parent was unlikely to change in a reasonable time.

¶39 *2. Whether the District Court erred in not finding guardianship to be the preferred permanency option and not denying the Petition for Termination.*

¶40 Mother asserts the District Court did not "thoughtfully consider" guardianship as well as termination in deciding that termination and adoption were in M.F.'s best interests. Mother further argues that the statutory presumption under § 41-3-604(1), MCA—that termination is in the best interests of children where a child has been in non-kinship foster care for 15 months of the most recent 22 months—is not applicable as the Department did not engage in reasonable efforts to reunify Mother and M.F. However, our conclusion that the Department provided reasonable efforts to reunify Mother and M.F. negates Mother's argument in this regard.

¶41 From our review of the record, it is clear the District Court thoughtfully considered guardianship versus termination. CPS Carr and CASA Whedbee testified they believed termination to be the preferred option to maintain a sense of safety and stability for M.F. M.F. expressed over time her desire to not live with Mother, or with her sister, D.C.—

23

whom she did not know well and with whom M.F. did not want to live—and her ongoing anxiety and fear of being placed in a living situation with Mother where she is exposed to bad people coming and going from the residence. While the District Court noted it often prefers guardianship in these cases and understood guardianship to be permanent, guardianship would not necessarily protect M.F.'s sense of stability and safety in the same manner termination and adoption could. The court carefully weighed the testimony in this regard. Additionally, given Mother's failure to fully engage with chemical dependency treatment, she had shown little change from the time of prior Department involvement through the pendency of this case. This was not a situation where Mother merely needed a few more months to achieve success. Based on the evidence presented, Mother had thus far been unwilling to address her substance use issue and its impact on her ability to parent M.F. Mother failed to follow through with treatment and did not achieve or maintain sobriety. The District Court considered Mother's lack of engagement with treatment, together with M.F.'s substantial need for a stable, consistent primary caregiver, and determined Mother could not provide that role for M.F. within a reasonable time, and was not persuaded that guardianship was in M.F.'s best interests. *See In re A.B.*, 2020 MT 64, 399 Mont. 219, 460 P.3d 405. Mother failed to overcome the presumption that termination was in M.F.'s best interest and that adoption was preferable to guardianship.

**CONCLUSION**

¶42 The Department provided reasonable efforts to avoid removal and to reunify Mother and M.F. Those efforts were hindered by Mother's failure to acknowledge a substance use disorder and to understand its impact on her ability to parent M.F. Given the Department's

24

reasonable efforts, the family's prior involvement with the Department based on the same issues, and Mother's lack of engagement with the Department, the District Court did not err in terminating Mother's parental rights to M.F. Further, the District Court appropriately considered guardianship versus termination and adoption, and it appropriately applied the presumption of § 41-3-406(1), MCA.

¶43    Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE